## Pennsylvania Human Relations Commission *v.* Norristown Area School District, Appellant.

Argued May 5, 1975, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Horace A. Davenport,* for appellant.

*Roy Yaffe,* Assistant General Counsel, with him *Sanford Kahn,* General Counsel, for appellee.

OPINION BY JUDGE ROGERS, July 30, 1975:

This appeal by the Norristown Area School District (District) from an order of the Pennsylvania Human Relations Commission (Commission) presents the issue posed, but not answered, in footnote 29 of the opinion of Mr. Justice POMEROY writing for three Justices of our

Supreme Court in *Uniontown Area School District v. Pennsylvania Human Relations Commission*, 455 Pa. 52, 80, 313 A.2d 156, 171 (1973)[1]—that is, whether the Commission's definition of a segregated school is a regulation required when adopted to be filed with the Department of State by Section 21 of the Administrative Agency Law, Act of June 4, 1945, P.L. 1388, *as amended*, 71 P.S. §1710.21 and further required to be deposited with the Legislative Reference Bureau by the Commonwealth Documents Law, Act of July 31, 1968, P.L. 769, 45 P.S. §1101 et seq.; or whether it is merely a statement of policy exempted from the filing and depositing requirements of the cited statutes.[2]

---

1. By unanimous decision, the Supreme Court in the case cited in the text affirmed the Commonwealth Court's holdings in *Uniontown Area School District v. Pennsylvania Human relations Commission*, 6 Pa. Commonwealth Ct. 281, 294 A.2d 410 (1972) that the Commission is empowered to require the submission by school authorities of plans to correct *de facto* segregation and that the Commission's recommendation that such plans achieve racial balance within 30% of the racial composition of the school population was not arbitrary or capricious.

2. The procedural history of the instant case is: the Commission requested the District to file an integration plan in 1968; the District obtained approval of a plan in 1969; the District implemented the approved plan by various means, including the construction of new schools, and achieved integration of all of the schools except in its neighborhood elementary schools attended by students of the grades kindergarten through fourth; the District declined to integate the elementary schools because it believed children of these tender years should not be bused and for other reasons; the Commission, based on the District's failure to integrate the described elementary schools filed a complaint charging the District with maintaining segregated schools; and after a hearing, at which the District relied solely on its contention that the Commission's "Recommended Elements of a School Desegregation Plan" and another Commission document called "Desegregation Guidelines for Public Schools" were invalid as not promulgated in accordance with the Administrative Agency Law and the Commonwealth Documents Law, the Commission ordered the District to file a plan in conformity with the "Recommended Ele-

The definition in question appears in a document entitled "Recommended Elements of a School Desegregation Plan" promulgated jointly by the Commission and the State Department of Public Instruction (now the Department of Education) on May 15, 1968, and is as follows:

"How nearly does the desegregation plan bring the per cent Negro pupils in each building to within 30% of the per cent Negro pupils among the buildings of the same grade span?"

The District contends that the definition, although within the power of the Commission to make as decided by this and the Supreme Court in the *Uniontown* case, was an exercise of the Commission's legislative rule-making power[3] and hence a regulation required for its validity to have been adopted in accordance with statutory procedures. The District contends, therefore, that since the document entitled "Recommended Elements of a School Desegregation Plan," containing the definition, was neither filed as provided by the Administrative Agency Law nor deposited for inclusion in the Pennsylvania Code as required by the Commonwealth Documents Law, the definition has no validity and cannot be the basis of a complaint by the Commission that the District is violating the law by maintaining *de facto* segregated schools.

The Commission contends that the quoted definition was an exercise of its interpretive rule-making power[4]

---

ments" and to take other actions not necessary to describe. The appeal here is from that order.

3. Conferred by Section 7(d) of the Pennsylvania Human Relations Act, Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. §957(d) empowering the Commission "To adopt, promulgate, amend and rescind rules and regulations to effectuate the policies and provisions of this act."

4. Conferred by Section 7(e) of the Pennsylvania Human Relations Act, 43 P.S. §957(e) empowering the Commission "To formulate policies to effectuate the purposes of this act, and make recommendations to . . . school district[s]. . . ."

and a mere statement of policy and not therefore subject to the statutory procedures for adoption of regulations.

Section 2(e), of the Administrative Agency Law, 71 P.S. §1710.2(e) and Section 102(12) Commonwealth Documents Law, 45 P.S. §1102(12) defines "Regulation" in similar terms, that is, as

> "any rule, regulation or order in the nature of a rule or regulation, [of general application and future effect], promulgated by any agency under statutory authority in the administration of any statute administered by or relating to the agency, or prescribing the practice or procedure before such agency."[5]

Only the Commonwealth Documents Law defines Statement of Policy, and this as

> "[a]ny document, except an adjudication or a regulation, promulgated by an agency which sets forth substantive or procedural personal property rights, privileges, immunities, duties, liabilities or obligations of the public or any part thereof, and includes, without limiting the generality of the foregoing, any document, interpreting or implementing any Act of Assembly, enforced or administered by such agency." 45 P.S. §1102(13).

The distinction between a regulation and a statement of policy is that the former is an exercise of delegated power to make a law and as binding on a reviewing court as a statute while the latter is merely interpretive, not binding upon the reviewing court but persuasive if it tracks the meaning of the statute. *Uniontown Area School District v. Pennsylvania Human Relations Commission, supra,* 455 Pa. 52, 76, 313 A.2d 156, 169 (1973).

The Commission's document, "Recommended Elements of a School Desegregation Plan," as its title suggests, does not lay down hard and fast standards with which

---

5. The bracketed phrase "of general application and future effect" is included in the Administrative Agency Law but excluded in the Commonwealth Documents Law.

districts must comply in order to conform to law. It
merely poses questions concerning the plan for integra-
tion as means of testing the plan's chances of proving
acceptable to the Commission. The questions are most
general in nature and there is nothing in the document
which states or implies that nonconformity of the plan
in any respect will bring automatic rejection. With re-
gard to the Commission's definition of a segregated
school as one having a disparity of Negro students 30%
greater or less than the per cent of Negro pupils among
buildings of the same grade span, which is here prin-
cipally complained of, the Commission asserts in its
brief that it is not meant to be nor is it in practice in-
flexibly applied. Our experience confirms this assertion.
Indeed, in the case of the *Uniontown School District,* one
of the five cases decided by this Court at 6 Pa. Common-
wealth Ct. 281, 294 A.2d 410, *supra,* the Commission
approved a proposal that an all white school remain such
because of transportation difficulties. In the instant case
the Commission has agreed that its recommendations of
a proper racial balance should not be required to be ad-
hered to in the case of kindergarten children and that
allowances should and would be made by reason of the
difficulty of busing in the narrow streets of Norristown.
In short, the documents in question,[6] including the 30%
range, in the words of the Commission's brief, "[have]
never been considered, by the Commission or the courts,
to be rigid, hard and fast legislative regulation[s]. The
use of [the 30% range] the limits of which were, itself,
flexible and capable of extension, appeared both in theory
and eventually in practice, to be the best method to
carry out a flexible case-by-case approach to school
[de]segregation." And, as the Commission's brief further

---

6. The Commission provides to school districts an additional
document called "Desegregation Guidelines," more general than the
"Recommended Elements."

asserts, its "Recommended Elements" is "merely a general policy statement by the two agencies [the Commission and the Department of Transportation] to assist local school districts in preparing a realistic desegregation plan. It provided those district with a starting point in developing their plans and offered a yardstick with which the districts could measure the potential problem areas to be explored and the degree of racial concentration which existed among its pupils and facilities. As its title indicates, those elements are merely recommendations on the part of the Commission and the Department of Instruction and, as such, are phrased as evaluation questions and not as legal requirements to which each school district must strictly adhere."

We hold therefore that the Commission's definition of a desegregated school as well as its other recommendations and guidelines are not regulations but statements of policy not required to be filed or deposited as required by the statutes referred to—thus accepting the Commission's view of their purpose and their use in practice. We are impelled, however, to note and comment upon the Commission's order here which directs the District to submit a plan "which will eliminate racial imbalance in its schools," defines racial imbalance in terms of the 30% range definition and requires that the plan "shall conform to all of the 'Recommended Elements of a School Desegregation Plan.'" We find this imperative to be inconsistent with Commission's statement in its brief that the definition is merely recommendatory. To require a District, on pain of violating a Commission order, to file a plan conforming in all respects to its "Recommended Elements" seems to us to treat the recommendations as something more than mere guidelines. We will assume that the Commission meant to require the filing of a plan which either conforms to the "Recommended Elements" or provides justification for deviations therefrom and that the Commission will review a plan not conform-

ing with the 30% range or other "Elements" in a fashion consistent with the description of the purpose and effect of its statements of policy contained in its brief.

Finally, the Commission argues in some detail that it was not required to deposit its policy statements with the Legislative Reference Bureau pursuant to the Commonwealth Documents Law because the statements were adopted prior to the effective date of that legislation, citing Sections 402, 409 and 503, 45 P.S. §§ 1402, 1409 and 1503. Although this issue was not briefed or argued by the appellant, we deem it helpful to declare that we agree with the Commission's interpretation of the Act as not requiring the deposit of statements of policy, as distinguished from regulations, adopted prior to its effective date, July 1, 1969.

ORDER

AND NOW, this 30th day of July, 1975, the order of the Pennsylvania Human Relations Commission is affirmed and the appeal of the Norristown Area School District is dismissed.