473 Pa. 334 (1977)
374 A.2d 671
PENNSYLVANIA HUMAN RELATIONS COMMISSION
v.
NORRISTOWN AREA SCHOOL DISTRICT, Appellant.
Supreme Court of Pennsylvania.
Argued January 17, 1977.
Decided June 3, 1977.
*335 *336 Butera & Detwiler, Philip R. Detwiler, King of Prussia, for appellant.
Roy Yaffe, Philadelphia, for appellee.
Before JONES, C.J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*337 OPINION OF THE COURT
ROBERTS, Justice.
This is an appeal[1] by the Norristown Area School Distrct (Norristown) from an order of the Commonwealth Court[2] affirming an order of the Pennsylvania Human Relations Commission (Commission) requiring Norristown to develop and submit a plan to eliminate racial segregation in its schools.[3] Norristown asserts that the Commission's definition of a segregated school is an invalid regulation because the Commission did not comply with the publication requirements of the Administrative Agency Law.[4] It contends that the Commission's order *338 is based upon an invalid regulation and therefore should be vacated.
We hold that the Commission's definition of a segregated school contained in the "Recommended Elements of a School Desegregation Plan," is a general statement of policy and not an administrative regulation subject to the publication requirements of the Administrative Agency Law. In this adjudication, the Commission used the definition of a segregated school as a flexible guideline and not as a binding administrative regulation.[5] We affirm.

I
Nine years ago, the Commission advised Norristown and 16 other Pennsylvania school districts that their schools were racially imbalanced,[6] and asked them to develop and submit desegregation plans.[7] To aid districts in formulating plans, the Commission and the Pennsylvania Department of Public Instruction (Department) set forth "Desegregation Guidelines for Public Schools"[8] *339 on March 29, 1968. These guidelines were sent to the superintendent of schools of Norristown. The Commission and the Department also suggested "Recommended Elements of a School Desegregation Plan"[9] on May 15, 1968. The Commission sponsored meetings and seminars during February and May of 1968 with Norristown and the other districts at which the desegregation guidelines and the recommended elements of a desegregation plan were fully discussed.
In June 1968, Norristown submitted a desegregation plan which the Commission rejected because it did not adequately provide for the methods and timetable by which racial imbalance would be corrected. Norristown submitted a supplementary plan which the Commission approved on May 11, 1969. From 1969 to 1972, Norristown took some steps to effectuate its desegregation plan but made no efforts to desegregate grades kindergarten through the fourth grade. On December 5, 1972, Norristown advised the Commission that it refused to correct the racial imbalance in grades kindergarten through fourth grade. The Commission interpreted Norristown's refusal to desegregate as an amendment to Norristown's May 11, 1969 plan. The Commission then disapproved Norristown's desegregation plan. After numerous attempts at conciliation, the Commission filed a complaint on March 6, 1973, alleging, inter alia, that Norristown discriminated against pupils in its school system in that it sanctioned racially segregated schools by failing to adopt and implement an acceptable plan to reduce the *340 amount of racial segregation. The complaint also alleged that Norristown's failure to adopt a plan denied an integrated education to its students in violation of sections 5(i)(1) and (4)(g) of the Pennsylvania Human Relations Act (PHRA).[10] After additional attempts at conciliation failed, the Commission conducted a public hearing in accordance with section 959 of the PHRA.[11] Norristown maintained that the hearing was "illegal." For the first time, six years after the guidelines were announced, Norristown contended that the "Desegregation Guidelines for Public Schools" and the "Recommended Elements of a School Desegregation Plan" were invalid because the Commission had not filed them with the Department of State pursuant to the Administrative Agency Law.[12] Although Norristown cross-examined the Commission's witness, Mr. Anliot, the Director of the Commission's Education Division, it did not present any evidence to refute the Commission's evidence that Norristown had violated section 5(i)(1) of the PHRA. The *341 Commission found that Norristown violated section 5(i)(1) of the PHRA and ordered Norristown to develop and submit a desegregation plan which would eliminate racial imbalance in its schools. Norristown appealed to the Commonwealth Court which unanimously affirmed the Commission's order.[13]
We granted Norristown's petition for allowance of appeal.

II
Norristown's sole contention is that the Commission's definition of a segregated school is invalid because it was not filed with the Department of State pursuant to the Administrative Agency Law.[14] It asserts that the adjudication *342 before the Commission was "illegal" because the Commission proceeded against Norristown on the basis of an invalid regulation. We agree with the Commonwealth Court which rejected Norristown's contentions and affirmed the Commission's order.
A. It is beyond cavil that the Commission is empowered to take steps to eradicate racial segregation found to exist within the school population of any Pennsylvania school district. In Pennsylvania Human Relations Commission v. Chester School District, 427 Pa. 157, 233 A.2d 290 (1967):
"[W]e laid to rest arguments . . . that the Human Relations Act did not permit the Commission to require school boards to take corrective measures to overcome de facto racial segregation within their districts." (emphasis in original)
Balsbaugh v. Rowland, 447 Pa. 423, 433, 290 A.2d 85, 90 (1972). Accord, Pennsylvania Human Relations Commission v. Uniontown Area School District, 455 Pa. 52, 313 A.2d 156 (1973) (plurality opinion). In Chester, supra, we noted that:
"the Legislature undoubtedly envisioned a case-by-case approach to the elimination of racial imbalance in public schools. . . . The Human Relations Commission, whose function is to work with the parties to the dispute in an attempt to alleviate the source of the friction through `conference, conciliation and persuasion,' *343 and whose procedure is considerably more flexible than the courts, is, as the Legislature recognized, better equipped to deal with this problem than the courts."
427 Pa. at 179, 233 A.2d at 301. Although "de facto segregation" is not defined in the PHRA, we recognized in Chester that this concept provides an adequate standard to allow the Commission to proceed on a case-by-case basis.[15]
After our decision in Chester, the Commission formulated "Desegregation Guidelines for Public Schools" and "Recommended Elements of a School Desegregation Plan" as flexible guidelines to aid its efforts to work with school districts to eliminate racial imbalance in the Commonwealth's schools.[16] Since the Commission is required to conciliate before it institutes formal proceedings against the parties, statements of policy are helpful to both the Commission and schools in achieving the mandate of the PHRA.[17] By providing school districts with general statements of policy, the Commission encourages voluntary compliance with the PHRA by *344 furnishing school districts with greater information concerning what is expected in desegregation plans.
In Pennsylvania Human Relations Commission v. Uniontown Area School District, 455 Pa. 52, 313 A.2d 156 (1973) (plurality opinion), we recognized that the Commission's recommendation, that desegregation plans achieve a racial composition for each grade within 30% of the racial composition within the school district, is reasonable. It was noted that it is within the Commission's power to pursue such a policy.[18]
B. Norristown argues that in announcing the "Desegregation Guidelines for Public Schools" and "Recommended Elements of a Desegregation Plan," the Commission has engaged in rule-making. It asserts that these guidelines cannot serve as a basis for the Commission's order. The Commission maintains that these guidelines are merely general statements of policy which are helpful in assisting both the Commission and school districts in developing desegregation plans. It argues that it has not treated these guidelines as administrative regulations having the force of law. The Commission contends that as general statements of policy, they are not subject to the publication requirements of the Administrative Agency Law. It asserts that nothing precludes it from using these statements of policy for guidance in its case-by-case adjudications.
We hold that the guidelines set forth in the "Recommended Elements of a School Desegregation Plan" *345 and "Desegregation Guidelines for Public Schools" are statements of policy and not regulations subject to the filing and publication requirements of the Administrative Agency Law. The Commission disseminated statements of policy, made recommendations to school districts to effectuate these policies, and when conciliation attempts failed, proceeded by adjudication. We find nothing improper in this procedure.
The Administrative Agency Law envisions that administrative agencies may proceed by rule-making or adjudication. Compare 71 P.S. § 1710.21 (1962) with 71 P.S. § 1710.31 (1962). Under the PHRA, the Commission is authorized to promulgate rules and regulations,[19] formulate policies and make recommendations to school districts to effectuate these policies,[20] and file complaints and conduct public hearings if efforts at conciliation fail.[21] Nothing in the Administrative Agency Law or the PHRA prevents the Commission from proceeding by way of adjudication rather than by rule-making. Pennsylvania Human Relations Commission v. Chester School District, 427 Pa. 157, 179, 233 A.2d 290, 301 (1967) ("The Legislature undoubtedly envisioned a case-by-case approach to the elimination of racial imbalance in public schools").[22]
*346 Administrative regulations are subject to the publication requirements of the Administrative Agency Law,[23] while statements of policy are exempt from the filing requirements.[24] Although we recognize that in *347 some situations it may be difficult to differentiate between administrative regulations and statements of policy which are not rules or regulations,[25] we are persuaded by the language and form of the guidelines as well as the Commission's characterization and treatment of the guidelines, that they are statements of policy.[26]
The Commission asserts that it has not departed from its case-by-case approach to racial imbalance in schools, but has merely formulated general policy statements and made recommendations to aid school districts in developing plans which the Commission will find acceptable. The Commission maintains that it has not treated these guidelines as binding regulations,[27] and makes no claim *348 that they have the force of law.[28] As the Commonwealth Court observed:
"The Commission's document, `Recommended Elements of a School Desegregation Plan,' as its title suggests does not lay down hard and fast standards with which districts must comply in order to conform to the law. It merely poses questions concerning the plan for integration as means of testing the plan's chances of proving acceptable to the Commission. The questions are most general in nature and there is nothing in the document which states or implies that nonconformity of the plan in any respect will bring automatic rejection. With regard to the Commission's definition of a segregated school as one having a disparity of Negro students 30% greater or less than the per cent of Negro pupils among buildings of the same grade span, which is here principally complained of, the Commission asserts in its brief that it is not meant to be nor is it in practice inflexibly applied. Our experience confirms this assertion."[29]
Pennsylvania Human Relations Commission v. Norristown Area School District, 20 Pa.Cmwlth. at 560, 342 A. 2d at 467.
*349 In holding that these guidelines are not regulations, we are persuaded by the reasoning of the Court of Appeals for the District of Columbia, a court with extensive experience in reviewing administrative determinations. In Pacific Gas & Electric Co. v. FPC, 164 U.S.App.D.C. 371, 506 F.2d 33 (1974), the FPC, in response to a natural gas shortage, issued an order directing pipeline companies which expected periods of shortage to file curtailment plans. There was a wide variety of priority schedules in the plans submitted. Sensing the need for guidance, the FPC adopted another "order" which set forth the FPC's view of proper curtailment plans. The agency stated that in its view, curtailment plans should establish priorities based on the uses to which the gas would be put rather than on prior contractual commitments. The "order" further stated that the FPC intended to follow this priority schedule unless a company could establish that another priority schedule was in the public interest. A number of gas companies challenged the "order" alleging that it was a substantive rule which was invalid because the FPC had not followed rule-making procedures. The Court of Appeals rejected this contention and held that the FPC's "order" was a general statement of policy which was exempt from the rule-making requirements of the Administrative Procedure Act, 5 U.S.C.A. §§ 551 et seq. (1967).
The court articulated the distinction between substantive rules which must be promulgated through rule-making procedures and statements of policy which require no such procedures:
"An administrative agency has available two methods for formulating policy that will have the force of law. An agency may establish binding policy through rule-making procedures by which it promulgates substantive rules, or through adjudications which constitute binding precedents. A general statement of policy is the outcome of neither a rulemaking nor an adjudication; *350 it is neither a rule nor a precedent but is merely an announcement to the public of the policy which the agency hopes to implement in future rulemakings or adjudications. A general statement of policy, like a press release, presages an upcoming rulemaking or announces the course which the agency intends to follow in future adjudications.

........
The critical distinction between a substantive rule and a general statement of policy is the different practical effect that these two types of pronouncements have in subsequent administrative proceedings.. . . A properly adopted substantive rule establishes a standard of conduct which has the force of law. . . . The underlying policy embodied in the rule is not generally subject to challenge before the agency.
A general statement of policy, on the other hand, does not establish a `binding norm'. . . . A policy statement announces the agency's tentative intentions for the future. When the agency applies the policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued."[30]
The court upheld the FPC's decision to proceed by individual adjudications consistent with its statement of policy rather than by way of rule-making.
"The Commission issued the policy statement because the curtailment plans being submitted reflected sharp differences in philosophy which necessitated *351 Commission guidance in the curtailment area. In the absence of such a policy statement, the Commission could have proceeded on an ad hoc basis and tentatively approved curtailment plans filed under section 4 of the Act which the Commission found to be just and reasonable. In following such a course the only difference from the present situation would be that the Commission would be acting under a secret policy rather than under the publicized guidelines of Order No. 467. The argument that an agency must follow rulemaking procedures when it elects to formulate policy by a substantive rule has no application in this case. Order No. 467 does not establish a substantive rule. Although the Commission is free to initiate a rulemaking proceeding to establish a binding substantive rule, the Commission apparently intends to establish its curtailment policies by proceeding through individual adjudications. Order No. 467 merely announces the general policy which the Commission hopes to establish in subsequent proceedings."
506 F.2d at 41 (footnote omitted).
Like the FPC, the Commission has chosen to proceed through individual adjudications consistent with its general statement of policy. We find no abuse of discretion in the Commission's actions. In light of the Commission's duty to resolve disputes by "conference, conciliation and persuasion," the adoption of statements of policy and guidelines can only aid the Commission's delicate task of correcting racial imbalance in the Commonwealth's schools. Moreover, general statements of policy encourage public dissemination of the Commission's views prior to their actual application.[31]
*352 C. The black enrollment in Norristown elementary schools is 23.13%. During the 1967-1968 school year, three elementary schools were predominately black. For example, in one school, 84.77% of the students were black. Seven elementary schools had less than 6.5% black students.[32] Some six years after Norristown was first asked to submit a desegregation plan, similar racial imbalance existed.[33] Norristown does not contend that this evidence is insufficient to constitute segregation within the meaning of the PHRA.
Order affirmed.
JONES, former C.J., did not participate in the decision of this case.
*353 MANDERINO, J., joined and filed a concurring opinion.
POMEROY, J., filed a dissenting opinion in which EAGEN, C.J., joins.

APPENDIX A

March 29, 1968.

Desegregation Guidelines for Public Schools

Commonwealth of Pennsylvania.
The Pennsylvania Human Relations Commission together with the Department of Public Instruction of the Commonwealth of Pennsylvania set forth the following guidelines for school districts (administrative units) in dealing with segregation in public schools.

1. Segregation as a factor in public education

When any one public school building comes to be viewed as improperly exclusive in fact or in spirit; when it is viewed as being reserved for certain community groups; when morale, teacher and pupil motivation and achievement are affected by the racial imbalance, the school system is being adversely affected by segregation. In other words, segregation is not an arbitrary numerical relationship of one group to another. Segregation becomes a factor adversely affecting education when an untoward concentration of any racial group in one building begins to destroy the functioning of the entire system as a "common school."
The common school has long been viewed as a basic social instrument in attaining our traditional goals of equal opportunity and personal fulfillment. The presence in a single school of children from varied backgrounds is an important element in the preparation of young people for active participation in the social and political affairs of our democracy.

*354 In-so-far as possible every school building should reflect in its enrollment a cross section of the entire community.

2. Responsibility for correcting discriminatory actions

Any action, direct or indirect, overt or covert, which fosters racial segregation in the public schools, is against the public interest, and should not be taken by any public agency. Whenever any such action, past or present, has adversely affected public education, it is the responsibility of public school authorities to correct it, forthwith.

3. Racial inclusiveness of staff

A component of quality education is a racially inclusive staff at all professional, non-professional and administrative levels. A desegregated staff affords positive educational values. All children need role models with whose ethnic backgrounds they can identify, and they also need to be taught at times by those who are racially different. Nothing herein is to be interpreted as calling for discrimination in favor of less qualified teachers because of their race.

4. Desegregation a local responsibility

Responsibility for coping with segregation rests with local school authorities. This is in keeping with the spirit of local control. It allows consideration for local conditions which may affect desegregated education. Such policy allows for the widest innovation in school assignment and program to meet local needs. Hence, the Department of Public Instruction and the Human Relations Commission proceed in correcting segregated conditions by requiring that each local public school district affected submit its own plans for dealing with the problem as the first step in their enforcement procedure.

*355 5. Program consistent with policy

The state agencies involved in supervising the desegregation process realize that changing policies and desegregation of pupils, teachers and staff are but the first steps in meeting the requirements of these guidelines. These agencies wish to cooperate with public school officials in every way possible to strengthen programs designed to produce mutual respect and trust between groups. They urge the reexamination of curriculum to make sure the contributions of all groups are included. They urge the reexamination of the treatment of all minorities in our common history. This they propose for all schools  not just those which have minority children enrolled. In other words, these proposals are designed to achieve good education for all children  not just special education for the minorities. Further, they ask cooperation of local school districts in the development of stronger programs of in-service training in human relations both for administrative staff and teachers.

6. Continuous evaluation and preventive action

Public school districts with concentrations which adversely affect education will be subject to continuing examination by the Pennsylvania Human Relations Commission and the Department of Public Instruction. Hence constant study and evaluation should be made at the local level to catch these undesirable trends in their incipient stages, and deal with them while they are in manageable proportions. In situations where action is being taken to apply corrective measures to existing concentrations, care should be taken to provide follow-up to make sure future imbalances do not occur.

7. Community participation

Local boards of education should make wide use of community involvement in the preparation of their plans.

*356 APPENDIX B

May 15, 1968

Recommended Elements of a School Desegregation Plan

by

Pennsylvania Human Relations Commission

and

Department of Public Instruction
1. Does the desegregation plan indicate the projected racial composition of each elementary and secondary school attendance area and the racial composition of the total staff of each building  as of the completion dates of each step?
2. Does the desegregation plan identify the location of proposed school building construction sites?
3. How nearly does the desegregation plan bring the per cent Negro pupils in each building to within 30% of the per cent Negro pupils among the buildings of the same grade span?
4. Does the desegregation plan include procedures to affirmatively and effectively recruit and assign an integrated staff at all levels for all schools?
5. Does the desegregation plan correct any untoward concentrations of professional or non-professional Negro staff in any buildings?
6. Does the desegregation plan equally match the services of its professional staff and program with the educational needs of each school building?
7. Does the desegregation plan include plans for in-service training of staff to meet the needs and problems incident to the implementation of desegregation plans?
8. Does the desegregation plan include steps to include intergroup education programming and the inclusion of the contributions of Negroes and other racial and *357 ethnic groups in the history courses about Pennsylvania and the United States?
9. Does the desegregation plan include a timetable indicating deadline dates by which each step will be completed? Are these dates as early as possible?
10. Does the desegregation plan indicate involvement of the community in its development and implementation?
11. Is the desegregation plan consistent with the Long Range Development Plan submitted to the Department of Public Instruction?
MANDERINO, Justice, concurring.
I join in the opinion of Mr. Justice Roberts, but would like to add additional comments concerning the use of the word imbalance in discussing unlawful discriminatory practices. The Pennsylvania Human Relations Act outlaws various discriminatory practices if such practices are based on a person's race, color, religious creed, ancestry, age, sex, national origin and in certain cases a person's handicap or disability. Every imbalance does not, per se, establish discriminatory practices. If it did, we would in effect be sanctioning a quota system. No public institution can have or is legally required to have a perfect balance. Therefore, a racial imbalance, or a sex imbalance, or a national origin imbalance does not in and of itself establish a discriminatory practice. If it did, then every institution would be required to have, in relation to the community's population, the same ratio of Catholic, females, blacks, Italians, Jews, blind persons and so on. I, therefore, object to the use of the word imbalance as implying a result brought about by unlawful practices.
When, however, a substantial degree of imbalance is present, one may reasonably infer that the substantial imbalance has resulted from unlawful activity. In this *358 case, the statistical guidelines issued by the Human Relations Commission were simply an announcement as to the degree of imbalance which the Commission would consider as sufficient evidence from which to infer that the imbalance resulted from unlawful activity. Such guidelines are obviously helpful, indeed desirable. Regardless of the guidelines, however, the inference drawn by the Commission in this case that the degree of imbalance was sufficient to conclude that the Act had been violated was a reasonable inference to be drawn. If it were not, it could of course be struck down. Since the evidence before the Commission, however, indicated a substantial degree of imbalance, the Commission properly concluded that discriminatory practices existed and it could properly order a remedy.
A Commission order cannot be sustained merely on the basis of racial imbalance or any other kind of imbalance. Such an order can be sustained only if the imbalance presented is of such a substantial degree that it is reasonable to infer that unlawful discrimination preceded the imbalance.
POMEROY, Justice, dissenting.
I am obliged to dissent from the majority's disposition of the important question of administrative law presented by this appeal.[1] The Court holds that the mathematical definition of de facto segregation promulgated by the Human Relations Commission is but a general statement of policy, and so is not an administrative regulation subject to either the notice and comment requirements of the Commonwealth Documents Law, 45 Pa.C.S.A. § 1101 *359 et seq. (Supp. 1977-1978), or the filing and publication requirements of the now-repealed Sec. 21 of the Administrative Agency Law, Act of June 4, 1945, P.L. 1388, as amended, 71 P.S. § 1710.21.[2] I am unable to agree.

I.
For an administrative agency in Pennsylvania to assure that regulations which it issues are valid and enforceable, *360 the agency must comply with certain procedural requirements of the Commonwealth Documents Law, supra. These include providing public notice of the proposed rule, making a request for written comments by any interested party, giving due consideration to such comments, holding "hearings as seem appropriate," and submitting the finally-adopted rule for inclusion in the "Pennsylvania Code". 45 Pa.C.S.A. §§ 1201-1208. Three purposes, at the least, are served by these requirements: (1) they afford a democratic process of providing affected or interested citizens an opportunity to participate in the formulation of standards which govern their conduct; (2) they give the rulemaking agency the benefit of a wide spectrum of thought on the proposed rule; (3) they apprise regulated parties of prescribed conduct.[3] These purposes would seem to be particularly important with regard to the Commission's de facto segregation definition, touching as it does upon one of the more sensitive issues of our day and one about which informed judgment is divided. See Uniontown Area School District v. Pennsylvania Human Relations Commission, 455 Pa. 52, 63-75, 313 A.2d 156, 161-168 (1973). The Commission argues, however, that the definition in question is not a regulation within the meaning of the Act, but a guideline merely, a statement of policy without binding effect, and thus not subject to the notice and comment requirements of the statute.[4]
*361 The majority is persuaded by the Commission's characterization of its rule for two reasons, neither of which can I accept. The first is "the language and form of the guidelines". Opinion of the Court ante at 678. By this I take it that the Court is referring to the wording of the title of the document which contains the segregation definition  "Recommended Elements of a School Desegregation Plan"  and the fact that the definition is framed not as an imperative but in the form of a question:
"3. How nearly does the desegregation plan bring the percent Negro pupils in each building to within 30% of the percent Negro pupils among the buildings of the same grade span?"
To my mind, focusing on the grammatical format of a statement affords a weak basis indeed for determining the applicability of the statutory requirement here involved.
Even if one acknowledges that the heading of a statement and its linguistic style is not an altogether irrelevant factor in deciding whether an administrative announcement is a "regulation", surely the agency's characterization of it as "guideline", "recommendation", or "policy statement", being both self-serving and conclusory, is entitled to but little weight in a court's decision as to what in actuality is the nature of the statement and whether the agency must comply with notice and comment procedure. In an analogous situation, our courts have declined to allow form to be determinative and have held that an informal agency letter could suffice as an appealable administrative "adjudication" for purposes of § 2(a) of the Administrative Agency Law. See Finkle v. Pa. State Real Estate Commission, 17 Pa.Cmwlth. 221, 331 A.2d 593 (1975); Newport Homes, Inc. v. Kassab, 17 Pa.Cmwlth. 317, 332 A.2d 568 (1975). See also Columbia Broadcasting System v. United States, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942). Applying that reasoning here, it is the Commission's application of its *362 rule which should receive the major consideration. As the Court of Appeals for the Third Circuit held in Texaco v. F.P.C., 412 F.2d 740, 744 (1969), a court must look to the operation of an agency's ruling and determine whether or not "rights and obligations" are imposed on affected parties.
Recognizing that this is the more important inquiry, the majority does purport to look to the "treatment of the guidelines." Opinion of the Court ante at 678. It concludes, however, that the Commission's de facto segregation definition has not been applied in a binding fashion. I disagree.
The Commission's "guideline" characterization is belied by the express terms of its final orders filed in this and other cases. In the present case, the Commission's order directs the school district to submit a desegregation plan which will eliminate racial imbalance, a condition which the order flatly declares to be present in schools "having a percent Negro enrollment less than or more than 30% of the percent of Negro pupils among the buildings of the same grade"; the order also stipulates that the plan shall conform to the "Recommended Elements" definition of de facto segregation.[5] In Uniontown, supra, the Commission issued five similar orders in regard to the five school districts involved in that appeal. 455 Pa. at 59-60, 313 A.2d 156. More recently, in the case of Pennsylvania Human Relations Commission v. School District of Philadelphia, 23 Pa.Cmwlth. 312, 352 A.2d 200 (1976), the Commonwealth Court observed that the Commission in that case "insisted that any plan *363 submitted by the District must bring all of the Philadelphia schools within its Recommended Element No. 3." Id. 23 Pa.Cmwlth. at 325, 352 A.2d at 208. It is difficult to imagine how any rule or regulation formally adopted in accordance with law could be given a more imperative rendering than this.[6] In the light of these cases, I have no hesitation in saying that the rule before us "establishes a standard of conduct which has the force of law." Pacific Gas & Electric Co. v. F.P.C., 164 U.S.App.D.C. 371, 506 F.2d 33, 38 (1974).[7]
The Commission argues, however, that this characterization of its rule as an inflexible norm is inaccurate; it asserts that deviations from the 30 percent range definition have in fact been permitted. It is on the basis of this assertion (in addition to the above "language" argument) that the majority concludes that the definition is not a regulation subject to notice and comment requirements.
Although the Commission cites no reported decisions to support its claim, it may be conceded that on occasion *364 it does make exceptions to its "guidelines".[8] Thus among the Commission's conclusions of law in the instant adjudication is the following:

"Absent persuasive justification for an exception to `Recommended Elements of a School Desegregation Plan' number 3, a segregated school is one in which its percent Negro enrollment is less than or more than 30 percent of the percent Negro pupils among the buildings of the same grade span." (Emphasis added).
Accepting this statement as an accurate illustration of the manner in which the Commission applies its pronouncement, the definition may thus be described as a general rule to which exceptions will be made, but only for "persuasive" reasons. It operates, then, in the same manner as a rebuttable presumption and has the full force of substantive law, shifting the burden of persuasion to respondents in Human Relations Commission proceedings.[9] As such, it is nothing less than a "regulation" as that term is used in the statute in question. See *365 Pickus v. United States Board of Parole, 165 U.S.App.D. C. 284, 507 F.2d 1107 (1974).[10]
I do not conceive it to be the function of a court to strive to release an administrative agency from the requirements of the Commonwealth Documents Law. The salutary purposes of that Act are too easily defeated when we sanction closed-door rulemaking cloaked in the guise of rendering "policy guidelines". That this should occur in a case dealing with a subject of crucial importance to the community and where the need for informed and even-handed administrative decision-making is great is, in my view, most unfortunate. I therefore adhere to the view expressed by the plurality in Uniontown, supra 455 Pa. at 80 n. 29, 313 A.2d 156, 171, that this de facto segregation definition, while a permissible exercise of administrative power, is "clearly a substantive rule of law".

II.
According to the analysis of the majority, the medium employed by the Human Relations Commission to exercise its statutory authority to define segregation has been case-by-case adjudication, not the promulgation of rule. For the reasons stated in part I, supra, I disagree with that analysis; the Commission's approach is essentially the application of its a priori mathematical formula *366 to the facts at hand.[11] That point aside, I add a few words concerning the propriety of the Commission's foresaking rulemaking in favor of an adjudicative approach.
In Uniontown, 455 Pa. at 75, 313 A.2d 156, the plurality held that the Commission's definition of de facto segregation could not be viewed as an interpretation of legislative intent with regard to the proscription against "unlawful discriminatory practice[s]" in the Human Relations Act, 43 P.S. § 955. The rule was upheld, however, because of a finding that in the Human Relations Act the General Assembly had granted to the Commission broad "legislative" (as contrasted with "interpretative") power under the Act; given that finding, the rule relative to segregation was as "binding upon a court as a statute", review being limited to an ascertainment of "reasonableness". Id. at 76, 313 A.2d at 169.
I am of the view that in exercising a power which is legislative in nature, an administrative agency in this Commonwealth should establish through the rule making process some identification or definition of conduct which it will monitor and which will cause it to take remedial action. The agency's basic legislative tenets should be announced through rule making as the closest approximation to the legislative process, rather than by ad hoc decision-making, which approaches the judicial *367 process.[12] The Human Relations Commission has been endowed by the General Assembly with a broad grant of legislative power, for the Act itself nowhere defines the conduct which is interdicted, viz., discrimination. If the Commission is to have the relatively unrestrained authority to identify discrimination of the kinds prohibited by the Act and then to fashion remedies to eliminate those evils, it seems to me that the Commission should be held to strict compliance with notice and comment requirements  i.e., rulemaking procedures  which facilitate the openness and accountability which should accompany legislative decision-making.[13] It would, of course, still be for the Commission to apply the rules or regulations it had promulgated on a case-by-case basis as they arise; but the basic rules of the game would be known ahead of time. Where, however, the Commission carries out its legislative mandate in the absence of a regulation properly adopted as prescribed by law, it does so on an undefined basis, insulated from significant guidance or restraint from either statute, rule, or court.[14]
*368 To limit the exercise of unbridled administrative discretion, as well as to avoid the possibility of inconsistent treatment of individual cases, Professor Davis proposes that there should be a "requirement, judicially enforced, that administrators must strive to do as much as they reasonably can do to develop and to make known the needed confinements of discretionary power through standards, principles, and rules." K.C. Davis, Administrative Law Treatise § 6.13, at 278 (Supp. 1970). See also Davis, Administrative Law in the Seventies §§ 2.00-2.00-6 (1976); R. Stewart, "The Reformation of American Administrative Law", 88 Harv.L.Rev. 1667, 1698-1702 (1975). I find that advice sound in general, and of particular pertinence to the case at bar.
In sum, it is my view that the usefulness, delicacy and importance of the task confided to the Human Relations Commission but serve to emphasize that accomplishment of its undertaking should not be jeopardized by an avoidance of the process which is best designed to make known to the public that which the public can expect and that which is required of it.
EAGEN, C.J., joins in this dissenting opinion.
NOTES
[1] We hear this appeal pursuant to the Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, art. II, § 204(a), 17 P.S. § 211.204(a) (Supp. 1976).
[2] Pennsylvania Human Relations Commission v. Norristown Area School District, 20 Pa.Cmwlth. 555, 342 A.2d 464 (1975).
[3] The Commission found that Norristown violated section 5(i)(1) of the Pennsylvania Human Relations Act (PHRA), Act of October 27, 1955, P.L. 744, § 5(i)(1), as amended, 43 P.S. § 955(i)(1) (Supp. 1976), and ordered Norristown to "develop and submit to the Pennsylvania Human Relations Commission for its approval a plan and timetable for implementation of that plan which will eliminate racial imbalance in its schools."
[4] Administrative Agency Law, Act of June 4, 1945, P.L. 1388, as amended, formerly codified in 71 P.S. § 1710.21, as amended by Act of June 26, 1963, P.L. 180. The Administrative Agency Law was repealed by Act of July 31, 1968, P.L. 769, art. VI, § 609(a)(14), 45 P.S. § 1609(a)(14) (Supp. 1976). The publication requirements of the Administrative Agency Law have been superseded by the Commonwealth Documents Law, Act of July 31, 1968, P.L. 769, art. I, §§ 1101 et seq. (Supp. 1976). Since the "Desegregation Guidelines for Public Schools" and the "Recommended Elements of a School Desegregation Plan" were set forth on March 29, 1968 and May 15, 1968 respectively, they are not subject to the Commonwealth Documents Law. With certain exceptions not applicable to regulations which were subject to the Administrative Agency Law, see 45 P.S. § 1402 (Supp. 1976), the Commonwealth Documents Law exempts all regulations filed prior to its effective date. See 45 P.S. § 1208 (Supp. 1976). Statements of policy filed prior to the effective date of the Commonwealth Documents Law are also exempt. See id. The Commonwealth Documents Law has been amended by the Act of July 9, 1976, P.L. 877, §§ 1 et seq., effective September 9, 1976, 45 Pa. C.S.A. §§ 501 et seq. (1977 Pamphlet). The title to the act has been deleted and the act has been revised. The 1976 amendment, however, has no effect on the present case. For convenience, this opinion will refer to this act as the Commonwealth Documents Law. For a discussion of the Administrative Agency Law and the Commonwealth Documents Law, see Zeiter, The New General Rules of Administrative Practice and Procedure and the Commonwealth Documents Law, 44 Pa.Bar Quarterly 109 (1972).
[5] In its brief, Norristown explicitly states that it is not challenging the substance of the Commission's definition of a segregated school. Neither does Norristown raise the sufficiency of the evidence to support the Commission's order.
[6] The Commission decided to first contact school districts with the most significant racial imbalance. The first districts contacted were those in which any one school building contained more than 80% black students and in which the percentage of black students in any building deviated 30% or more from the percentage of black students in the district.
[7] The Commission requested Norristown to develop a plan prior to the announcement of the guidelines at issue here.
[8] The "Desegregation Guidelines for Public Schools" sets forth the general policies of the Commission and the reasons why desegregation is an important social goal. It also advises school districts that desegregation is a local responsibility and offers the Commission's assistance in achieving the goal of an integrated education. The "Desegregation Guidelines for Public Schools" are set forth in full in Appendix A.
[9] The "Recommended Elements of a School Desegregation Plan" sets forth 11 questions suggesting areas which a school district should consider in developing a desegregation plan. The "Recommended Elements of a School Desegregation Plan" are set forth in full in Appendix B.
[10] The complaint alleged:

"4. The respondent has in the past discriminated and continues until the present time to discriminate against pupils within its school system because of race, in that:
a. The respondent, the Norristown Area School District, has allowed and continues to allow the existence of public schools under its jurisdiction and control which are racially segregated.
b. The respondent has failed to adopt an acceptable plan and timetable for the implementation of such plan that would substantially reduce the amount of racial segregation in the Norristown Area public schools.
c. The respondent, by its present failure to adopt such plan and timetable, has withheld and continues to withhold the advantages of an integrated education from many pupils within the Norristown Area School District, denying them the equal protection of the law and equal educational opportunity.
d. The respondent's failure to adopt such plan and timetable for desegregation results in a continued denial of equal educational advantages in violation of Section 5(i)(1) and 4(g) of the Pennsylvania Human Relations Act."
[11] 43 P.S. § 959 (Supp. 1976).
[12] Act of June 4, 1945, P.L. 1388, as amended, formerly codified in 71 P.S. § 1710.1 et seq. (1962), as amended by Act of June 26, 1963, P.L. 180.
[13] The Commonwealth Court held that the "Desegregation Guidelines for Public Schools" and the "Recommended Elements of a School Desegregation Plan" were "not regulations but statements of policy not required to be filed or deposited" with the Department of State pursuant to the Administrative Agency Law. Pennsylvania Human Relations Commission v. Norristown Area School District, 20 Pa.Cmwlth. 555, 561, 342 A.2d 464, 468 (1975). The court adopted the Commission's view that the documents "[have] never been considered, by the Commission or the courts, to be rigid, hard and fast legislative regulation[s]. The use of [the 30% range] the limits of which were, itself, flexible and capable of extension, appeared both in theory and eventually in practice, to be the best method to carry out a flexible case-by-case approach to school [de]segregation." Id. at 560, 342 A.2d at 467 (insertions in original).
[14] Section 1710.21 of the Administrative Agency Law provided:

"Regulations adopted after September 1, 1963, shall have no effect until copies of such regulation have been printed or reproduced by the adopting agency and are available for public distribution upon request, and a copy thereof certified by the executive officer, chairman or secretary of the agency is filed in the Department of State and the Legislative Reference Bureau in such form and size as shall be agreed upon by the Department of State and the Legislative Reference Bureau. All regulations shall be numbered serially and have indicated thereon the agency which adopted them, and shall be approved as to legality by the Department of Justice before they are filed in the Department of State and the Legislative Reference Bureau. Failure of the agency to submit a regulation to the Department of Justice for such approval shall invalidate the regulation. Copies of all regulations shall be made available by the adopting agency upon request."
Act of June 4, 1945, P.L. 1388, as amended, formerly codified in 71 P.S. § 1710.21, as amended by Act of June 26, 1963, P.L. 180.
Norristown does not and could not contend that it did not receive notice of the "Desegregation Guidelines for Public Schools" and the "Recommended Elements of a School Desegregation Plan." The Commission sent a copy of the "Desegregation Guidelines for Public Schools" to the superintendent of schools of Norristown and distributed the "Recommended Elements of a School Desegregation Plan" to Norristown during the seminars and conferences held in May, 1968.
[15] "[D]e facto segregation `remains undefined in its full concept,' yet at the same time it is a meaningful term." Pennsylvania Human Relations Commission v. Chester School District, 427 Pa. 157, 158, 233 A.2d 290, 291 (1967) quoting Pennsylvania Human Relations Commission v. Chester School District, 85 Dauph. 18, 25, affd. 209 Pa.Super. 37, 224 A.2d 811, 820 (1966).
[16] See supra notes 8 and 9.
[17] "As an informational device, the general statement of policy serves several beneficial functions. By providing a formal method by which an agency can express its views, the general statement of policy encourages public dissemination of the agency's policies prior to their actual application in particular situations. Thus the agency's initial views do not remain secret but are disclosed well in advance of their actual application. Additionally, the publication of a general statement of policy facilitates long range planning within the regulated industry and promotes uniformity in areas of national concern."

Pacific Gas & Electric Co. v. F.P.C., 164 U.S.App.D.C. 371, 506 F.2d 33, 38 (1974).
[18] In Uniontown, the school districts alleged that the definition of a segregated school contained in the "Recommended Elements of a School Desegregation Plan" was arbitrary and capricious. This Court upheld the definition of a segregated school as reasonable and within the Commission's statutory authority. Pennsylvania Human Relations Commission v. Uniontown Area School District, 455 Pa. 52, 313 A.2d 156 (1973) (Mr. Justice Pomeroy filed an opinion announcing the judgment of the court in which Mr. Justice Eagen (now Mr. Chief Justice) and Mr. Justice O'Brien joined. This writer filed a concurring opinion in which Chief Justice Jones and Mr. Justice Nix joined. Mr. Justice Manderino concurred in the result).
[19] The Commission shall have the power:

"(d) To adopt, promulgate, amend and rescind rules and regulations to effectuate the policies and provisions of this act."
43 P.S. § 957(d) (1964).
[20] The Commission is authorized to:

"(e) To formulate policies to effectuate the purposes of this act, and make recommendations to agencies and officers of the Commonwealth or political subdivisions of government or board, department, commission or school district thereof to effectuate such policies."
43 P.S. § 957(e) (1964).
[21] Section 959 provides that the Commission must first attempt to eliminate an unlawful discriminatory practice by "conference, conciliation and persuasion," before it proceeds to public hearing on a complaint. 43 P.S. § 959 (Supp. 1976).
[22] See NLRB v. Bell Aerospace Co., 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974); NLRB v. Wyman-Gordon Co., 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969); FPC v. Texaco, Inc., 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964); SEC v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); Pacific Gas & Electric Co. v. FPC, 164 U.S.App.D.C. 371, 506 F.2d 33 (1974); K. Davis, Administrative Law Treatise § 5.01 at 292 (1958); Bernstein, The NLRB's Adjudication-Rule Making Dilemma Under the Administrative Procedure Act, 79 Yale L.J. 571 (1970); Robinson, The Making of Administrative Policy: Another Look at Rulemaking and Adjudication and Administrative Procedure Reform, 118 U.Pa.L.Rev. 485 (1970); Note, The Judicial Role in Defining Procedural Requirements for Agency Rulemaking, 87 Harv.L.Rev. 782 (1974).
[23] The Administrative Agency Law defines a "regulation:"

"`Regulation' means any rule, regulation or order in the nature of a rule or regulation, of general application and future effect, promulgated by an agency under statutory authority in the administration of any statute administered by or relating to the agency, or prescribing the practice or procedure before such agency."
71 P.S. § 1710.2(e) (1962).
Regulations adopted after September 1, 1963, but before July 31, 1968, have no effect until copies are printed or reproduced by the agency and are made available to the public on request, and a certified copy is filed in the Department of State and the Legislative Reference Bureau. Act of June 26, 1963, P.L. 180, repealed by Act of July 31, 1968, P.L. 769, 45 P.S. § 1609(a)(14) (Supp. 1976). Regulations adopted after July 31, 1968 are subject to the Commonwealth Documents Law, Act of July 31, 1968, P.L. 769, art. I, §§ 101 et seq., 45 P.S. §§ 1101 et seq. (Supp. 1976).
[24] The Administrative Agency Law makes no reference to statements of policies. Statements of policy which are not rules or regulations are not subject to the publication requirements of the Administrative Agency Law. The Commonwealth Documents Law defines statements of policy as:

"any document, except an adjudication or a regulation, promulgated by an agency which sets forth substantive or procedural personal or property rights, privileges, immunities, duties, liabilities or obligations of the public or any part thereof, and includes, without limiting the generality of the foregoing, any document interpreting or implementing any act of Assembly enforced or administered by such agency."
45 P.S. § 1102(13) (Supp. 1976).
The Commonwealth Documents Law retained a similar definition of rule or regulation as the Administrative Agency Law. Compare 71 P.S. § 1710.2(e) (1962) with 45 P.S. § 1102(12) (Supp. 1976). This evidences a recognition that statements of policy can be other than rules or regulations.
[25] K. Davis, Administrative Law Treatise § 5.01 at 290 (1958); Comment, A Functional Approach to the Applicability of Section 553 of the Administrative Procedure Act to Agency Statements of Policy, 43 U.Chi.L.Rev. 430 (1976); Pacific Gas & Electric Co. v. FPC, 164 U.S.App.D.C. 371, 506 F.2d 33, 37-38 (1974).
[26] Pacific Gas & Electric Co. v. FPC, 164 U.S.App.D.C. 371, 506 F.2d 33, 39 (1974) ("Often the agency's own characterization of a particular order provides some indication of the nature of the announcement."); K. Davis, Administrative Law Treatise § 5.01 at 141-44 (Supp. 1976); Functional Approach to the Applicability of Section 553 of the Administrative Procedure Act to Agency Statements of Policy, 43 U.Chi.L.Rev. 430 (1976).
[27] The Commission has approved desegregation plans in Allentown, Greater Johnstown, New Castle, Uniontown, and South Coatesville, all of which contain school buildings well outside of the 30% guideline recommended by the Commission. The Commonwealth Court found that the Commission had agreed to deviations from its recommendations with respect to Norristown itself:

". . . the Commission has agreed that its recommendations of a proper racial balance should not be required to be adhered to in the case of kindergarten children and that allowances should and would be made by reason of the difficulty of busing in the narrow streets of Norristown."
Pennsylvania Human Relations Commission v. Norristown Area School District, 20 Pa.Cmwlth. at 560, 342 A.2d at 467. The Commission's treatment of "Desegregation Guidelines for Public Schools" and the "Recommended Elements of a School Desegregation Plan" in this and other cases supports its contention that these announcements are flexible statements of policy and not administrative regulations.
[28] The Commission recognizes that statements of policy are subject to modification and parties may challenge the substance of such policies. See K. Davis, Administrative Law Treatise § 5.01 (Supp. 1976). However, Norristown only challenged the guidelines on procedural grounds. There is nothing to indicate that if Norristown had challenged the substance of the guidelines as applied to Norristown, the Commission would not have allowed them to raise this contention.
[29] The Commonwealth Court did note that the Commission's order was somewhat inconsistent with the Commission's position that the guidelines were statements of policies and not binding regulations. Subsequent to the Commonwealth Court decision, the Commission modified its order to permit Norristown to develop and submit a desegregation plan which did not conform to the "Recommended Elements of a School Desegregation Plan" if persuasive justification was presented. The Commission also modified the definition of a segregated school to permit deviations. Pursuant to Pa.R.A.P. 1926, we granted the Commission leave to supplement the record and file its amended order with this Court.
[30] For a discussion of agency statements of policy see, K. Davis, Administrative Law Treatise, § 5.01 (Supp. 1976); U.S. Department of Justice, Attorney General's Manual on the Administrative Procedure Act 14-15 at 30 (1947); Parker, The Administrative Procedure Act: A Study in Overestimation, 60 Yale L.J. 581 (1951); A Functional Approach to the Applicability of Section 553 of the Administrative Procedure Act to Agency Statements of Policy, 43 U.Chi.L.Rev. 430 (1976).
[31] In asserting that the guidelines at issue should be treated as regulations, the dissent relies heavily on the benefits of notice and comment procedures for the adoption of administrative regulations. Even if the guidelines were regulations, however, no such notice and comment procedures would have been required. The Administrative Agency Law, which was in effect when the guidelines were conceived, only required that administrative regulations be filed and made available for public distribution. Act of June 4, 1945, P.L. 1388, as amended, formerly codified in 71 P.S. § 1710.21, as amended by Act of June 26, 1963, P.L. 180. The notice and comment requirements of the Commonwealth Documents law do not apply retroactively to regulations adopted prior to its July 1, 1969 effective date. See 45 P.S. §§ 1201-02, 1208 (Supp. 1976).
[32] Elementary School 84.77% black enrollment
Gotwals Elementary School 72.29%
Rittenhouse Junior High 41.03%
Hancock Elementary School 39.27%
Hartranft Elementary 0%
Burnside Avenue Elementary.53%
Marshall Street Elementary 1.18%
Penn Square Elementary 3.10%
East Norristown Junior High 3.62%
Cole Manor Elementary 4.58%
Stewart Junior High 5.24%
Lincoln Elementary 6.21%
Roosevelt Elementary 10.25%

[33] Elementary 84.41% black enrollment
Gotwals Elementary 77.72%
Hancock Elementary 43.33%
Hartranft Elementary 0%
Burnside Elementary.29% (1 Black pupil)
Marshall Street Elementary 4.08%
Lincoln Elementary 6.53%
Cole Manor Elementary 6.72%
Roosevelt Elementary 12.31%
Paul V. Fly Elementary 13.02%

[1] The record in this case suggests that the appellant, Norristown Area School District, may have been recalcitrant in taking appropriate steps to eliminate an unjustifiable racial imbalance in its schools. It goes without saying that an attitude or conduct which has the effect of perpetuating a racially discriminatory situation is not to be condoned. Such considerations, however, can have nothing to do with the proper disposition of challenges to the legality of procedures by which government undertakes to identify and cure the asserted evil.
[2] At the time of the adoption, May 15, 1968, by the Human Relations Commission of the document entitled "Recommended Elements of a School Desegregation Plan" which contained its segregation definition here in dispute, the applicable law relative to effectuation of administrative regulations by publication was Sec. 21 of the Administrative Agency Law, 71 P.S. 1710.21. If compliance with this section was requisite and not performed, Sec. 21 provided that the document had "no effect". The Commission, presumably because it did not consider the document a regulation, did not comply. The Commonwealth Documents Law, 45 Pa.C.S.A. § 1101, et seq., (Supp. 1977-1978), was adopted July 31, 1968 and became effective generally on July 1, 1969, with the effective date of several sections being controlled by the date of publication of the first issue of the Pennsylvania Bulletin. Under the Documents Law it was obligatory on an agency to deposit with the Legislative Reference Bureau certified copies of all unfiled administrative regulations in effect on the effective date of the Documents Law, "in default of which such administrative regulations shall become invalid". 45 Pa.C.S.A. § 1402 (Supp. 1975). The current validity of the unfiled document here challenged must be determined in light of the Commonwealth Documents Law. The Court's reliance, ante at 680, n. 31, on Section 208 of the Documents Law for the proposition that that act is here inapplicable is misplaced. Section 208, 45 Pa.C.S.A. § 1208, provides that a regulation announced after the effective date of the Documents Law is not valid for any purpose until filed by the Legislative Reference Bureau, as a prelude to publication; the section does not speak to the current validity of a regulation which has had "no effect" under prior law. It is noted, however, that the definitions of the term "regulation" contained in the two statutes are essentially the same.

(The Commonwealth Documents Law has since been amended by the Act of July 9, 1976, P.L. 877, No. 160 (effective September 7, 1976). While the 1976 act effectuates a substantial reorganization and revision of the 1968 act, the substantive provisions of the earlier statute which are pertinent to the instant case, viz., sections 102-208 (45 Pa.C.S.A. §§ 1102-1208), remain unchanged. Although the title of the act ("Commonwealth Documents Law") has been eliminated by the Act of 1976, this opinion nevertheless uses that title for the sake of convenience.)
[3] See Texaco v. F.P.C., 412 F.2d 740, 744 (3d Cir. 1969), for a discussion of the purpose of the parallel federal statute, the Administrative Procedure Act, 5 U.S.C. § 551 et seq. (1970). See also W. Zeiter, "The New General Rules of Administrative Practice and Procedure and the Commonwealth Documents Law," 44 Pa.B.Q. 109 (1972); A. Bonfield, "Some Tentative Thoughts on Public Participation in the Making of Interpretative Rules and General Statements of Policy under the APA," 23 Admin.L.Rev. 101, 104-105 (1971).
[4] The statute defines the term "regulation" as follows:

"`Regulation' means any rule or regulation, or order in the nature of a rule or regulation. . . ." 45 Pa.C.S.A. § 1102(12).
Since the word is defined in terms of itself, it is of little value.
[5] The Commonwealth Court commented in this case that "[t]o require a District, on pain of violating a Commission order, to file a plan conforming in all respects to its `Recommended Elements' seems to us to treat the recommendations as something more than mere guidelines." 20 Pa.Cmwlth. 555, 561, 342 A.2d 464, 468. In an unusual, if not unprecedented, statement the court then "assumed" that the Commission "meant" to make provision for "justification for deviations therefrom." Id. It should be noted, however, that the court's mandate simply affirms the Commission's order.
[6] It is revealing to note that in School District of Philadelphia, supra, a case decided by the Commonwealth Court after it had decided the instant one, the court apparently considered itself unconstrained by its "mere policy statement" holding in the present case. That is, its order in School District of Philadelphia flatly requires the school district to submit a desegregation plan which cures "racial imbalance as defined by Recommended Element No. 3 of the Commission . . . ." Id. at 342, 352 A.2d at 216. To the same effect, see Pennsylvania Human Relations Commission v. School District of Pittsburgh, 28 Pa.Cmwlth. 154, 367 A.2d 829 (decided January 13, 1977). It seems to me impossible to avoid the conclusion that the Commonwealth Court does in fact accord to the Commission's segregation definition the status of a substantive rule of law.
[7] I cannot agree with the majority that Pacific Gas supports its result in this case. Entering into the circuit court's holding in that case that notice and comment procedures need not be complied with by the Federal Power Commission was the fact, adverted to by the court, that the FPC's policy establishing natural gas curtailment priorities had a relatively insignificant impact on regulated parties. 506 F.2d at 42. Certainly no one would argue that the impact of the de facto segregation definition before us is less than substantial.
[8] It is to be noted, however, that there is no support in the record in this case for the majority's statement, supra at 678, n. 27, that the Commission has sanctioned desegregation plans which are in non-compliance with the 30 percent definition. As to the quoted excerpt in the same note from the Commonwealth Court's decision regarding the Commission's permitting a deviation in the instant case, suffice it to say that the Commission's final order makes no such allowance for departures from the required mathematical ratio.
[9] The Commission has acknowledged the "regulation" status of others of its rules which operate in this manner, and has complied with the requirements of the Commonwealth Documents Law with respect thereto. See, for example, the Commission's regulation appearing at 16 Pa.Code § 41.102 (adopted May 16, 1975, 5 P.A.B. 1798):

"A written or unwritten employment policy or practice which excludes from employment applicants or employes because of pregnancy is in prima facie violation of the Pennsylvania Human Relations Act (43 P.S. § 951 et seq.). The burden shifts to an employer to justify, and clearly demonstrate, the factual basis for his or her assertion that exclusion from employment because of pregnancy is warranted."
[10] In Pickus, the Federal Board of Parole argued, inter alia, that its rule establishing factors which it would consider in exercising its discretion to parole eligible prisoners was merely a general statement of policy, not a regulation. The Court of Appeals for the District of Columbia disagreed:

"Although [the guidelines] provide no formula for parole determination, they cannot help but focus the decision-maker's attention on the Board-approved criteria. They thus narrow his field of vision, minimizing the influence of other factors and encouraging decisive reliance upon factors whose significance might have been differently articulated had [notice and comment] been followed." 507 F.2d at 1113.
[11] The following from Uniontown, supra, is instructive:

"The Commission proved a violation of the Human Relations Act in all three hearings involved here as follows: counsel for the Commission called as a witness Mr. Richard B. Anliot, the Commission's Director of the Education Division. Mr. Anliot, in his examination, introduced himself, testified to the existence of the `Desegregation Guidelines for Public Schools' and the `Recommended Elements of a School Desegregation Plan', and finally reviewed the statistics of racial distribution in appellants' schools, statistics which had been furnished by the school districts themselves, pointing out in what particular the statistics varied from the distribution permitted under the Commission's definition. The Commission then rested. Admittedly, no investigation was conducted into the operation of any district beyond ascertainment of the above statistical data." 455 Pa. at 59-60 n. 8, 313 A.2d at 160.
[12] Pennsylvania Human Relations Commission v. Chester School District, 427 Pa. 157, 233 A.2d 290 (1967), cited by the majority, is not authority for the Commission to ignore the necessity for a properly adopted regulation. There, evidence of racial imbalance was so pronounced that the Court concluded that the statistics "satisfy any definition of de facto segregation." Id. at 178, 233 A.2d at 301.
[13] Since judicial review of the exercise of "legislative" administrative power is restricted, procedures prescribed for rulemaking offer affected parties the only significant opportunity to challenge the wisdom of administrative policy. See A. Bonfield, "Public Participation in Federal Rulemaking Relating to Public Property, Loans, Grants, Benefits, or Contracts," 188 U.Penn.L.Rev. 540, 541-542 (1970).
[14] Cf. State Board of Pharmacy v. Cohen, 448 Pa. 189, 292 A.2d 277 (1972). In that case, the Board argued, inter alia, that it had authority to determine what constituted "grossly unprofessional conduct" under the Pharmacy Act for purposes of suspension and revocation of a pharmacist's license. Not disputing that point, this Court, speaking through Mr. Justice ROBERTS, held that in the absence of an exercise of administrative rulemaking power, the quoted statutory language was unconstitutionally vague:

"[T]he Board contends that its duty to `regulate the practice of pharmacy' gives it the power on a case by case basis to `make an ongoing evaluation of what constitutes unprofessional conduct.' We believe that such determinations may only be made by statute or rule. The exercise of the Board's power on a case by case basis not based on statute or rule suffers from constitutional infirmities of vagueness." Id. at 200-201, 292 A. 2d at 282-283 (Footnotes omitted).
See also, Hornsby v. Allen, 326 F.2d 605 (5th Cir. 1964); Holmes v. New York City Housing Auth., 398 F.2d 262 (2nd Cir. 1968).