E. P. WALKER v. W. T. CORWIN AND OTHERS (STATE BOARD OF VETERINARY MEDICAL EXAMINERS).[1]

No. 32,685.

May 23, 1941.

[1]Reported in 300 N. W. 800.

338

*Tom E. Davis, George L. Barnard,* and *F. N. Furber* for *Fowler, Youngquist, Furber, Taney & Johnson* (Of Counsel on reargument), for relator.

*K. D. Stalland,* Special Assistant Attorney General, for State Board of Veterinary Medical Examiners, respondents.

*S. A. Buttz* (Of Counsel), for Central Minnesota Veterinary Association.

STONE, JUSTICE.

*Certiorari* to review an order of the state board of veterinary medical examiners revoking relator's license to practice veterinary medicine in Minnesota.

The order was made after hearing of charges preferred by one not a member of the board. The chief offense charged against Dr. Walker was that in 1939 he maintained a professional connection with and lent his professional name to one Johnson, who was not licensed as a doctor of veterinary. medicine. Specifically, he was charged with procuring or permitting Johnson to diagnose the ailment of a sick mare, treat the animal, and share the resulting fee.

Action on the charges was pursuant to 3 Mason Minn. St. 1940 Supp. § 5851-8, providing for revocation of a license "when the holder is guilty of gross moral or professional misconduct." The evidence, we think, affords adequate basis for the order. State ex rel. Colberg v. Jensen, 205 Minn. 410, 286 N. W. 305.

Some time before the incident in question, relator, who resides at Willmar, where he maintains his home office, established a "branch office" at Melrose with Johnson in charge. To acquaint the public with the facts, a display advertisement—no mere professional card—was inserted in the local newspaper. It occupied one-eighth of the ordinary newspaper page and was in large type. The advertisement was that relator, as "Veterinary Surgeon," was

about to open in Melrose a "Veterinary office." On its face, it advertised "G. A. Johnson," in large type, as "Supply Mgr."

The sick mare belonged to a farmer by name of Duevel. He was about to call another veterinary when, at the suggestion of a fellow townsman of Johnson, the business was switched to him. There is testimonial conflict in respect to whether Johnson, expressly or by implication, led Duevel to believe that he was "the veterinarian." At any rate, being informed of the mare's condition, Johnson agreed to and promptly did arrive at the Duevel farm. In the interim he had talked with Dr. Walker over long-distance telephone and reiterated what Duevel had told him. The ailment was diagnosed as spinal septicemia, and both oral and intramuscular treatment was prescribed. Dr. Walker instructed Johnson as to the treatment and agreed to get up there as soon as possible.

Arriving at the farm, Johnson "looked at" the horse and administered the prescribed treatment. Later that evening Dr. Walker, and on subsequent occasions Dr. Walker and Johnson, administered similar doses. The mare survived.

Duevel paid for the "veterinarian service" (as indicated by his memoranda on the checks) the sum of $15.50. The two checks were payable to "G. A. Johnson & E. P. Walker." Both were cashed by Johnson. There is testimonial denial that Johnson kept any of the money. But, in view of his relationship with relator and of the rather specious explanation of how he was compensated for his activity in this and other matters, the evidence is easily open to the inference that he did share in the payment.

Testimony relative to the activity of Johnson is directed primarily at the Duevel matter. But it is open to the inference that Johnson acted with relator similarly in other matters, a conclusion not denied in argument or testimony.

It is also shown that over an area embracing at least three counties Walker maintained a network of "informers" in the persons of cream station operators, oil station attendants, restaurateurs, and others likely to learn of occasion for veterinary service.

Cards advertising "Dr. E. P. Walker, Veterinarian," were placed in their establishments, and they were paid 25 cents for each phone call made by them to Dr. Walker's "home office" informing him of a need for his service.

We think the evidence sustains the conclusion of the board that relator was guilty of gross professional misconduct within the meaning of the statute.

■ The point is made that the statute, in its use of the general words "gross moral or professional misconduct" without limitation, explanation, or definition, is void for uncertainty. We cannot agree. In its wording, the statute is as general in statement as practical utility may permit. But we cannot conclude that its expression of purpose and intent is so uncertain as to render it a nullity. Muller v. Theo. Hamm Brg. Co. 197 Minn. 608, 268 N. W. 204; Ex parte Lucas, 33 Okl. Cr. 407, 243 P. 990.

Complete certainty of definition is not required, especially where the attempt is to fix a standard of conduct rather than to condemn specific acts. In such case, definition of the class of acts to which the statute applies must in the nature of things be general and comprehensive. The use of broad, flexible terms in fixing the standard is inescapable. Mere difficulty in ascertaining whether close cases fall within its operation does not nullify a statute if by the measure stated it can be determined with reasonable certainty whether particular conduct is disapproved. State v. Northwest Poultry & Egg Co. 203 Minn. 438, 281 N. W. 753; State v. Eich, 204 Minn. 134, 282 N. W. 810.

The words in this statute must be understood to mean such activity as in the common judgment is deemed "gross moral or professional misconduct." State ex rel. Hathaway v. State Bd. of Health, 103 Mo. 22, 29, 15 S. W. 322. Considering the obvious purpose of the statute, which is protection of the public from incompetent and unworthy practitioners, "professional misconduct" of necessity involves conduct in the common judgment dishonorable. State ex rel. Powell v. State Medical Examining Board, 32

Minn. 324, 20 N. W. 238, 50 Am. R. 575; Aiton v. Board of Medical Examiners, 13 Ariz. 354, 114 P. 962, L. R. A. 1915A, 691. It is justifiable to assume that a reasonably definite conception of "professional misconduct" has developed for a profession so long established and regulated. See L. 1893, c. 31; L. 1897, c. 322; L. 1901, c. 291; L. 1903, c. 149; L. 1907, c. 419.

It is not controlling but still notable that within any reasonable meaning of the statute the activity of Dr. Walker was "professional misconduct." Procuring unauthorized practice or lending the professional name to another is a recognized professional misdeed. Lassen v. Board of Dental Examiners, 24 Cal. App. 767, 142 P. 505; Dilliard v. State Bd. of Medical Examiners, 69 Colo. 575, 196 P. 866; In re Van Hyning, 257 Mich. 146, 241 N. W. 207.

The rule in a majority of jurisdictions is that statutes having the same purpose and operation as § 5851-8 are not rendered fatally uncertain because the grounds for revocation are stated in general terms. Annotations, 5 A. L. R. 94; 79 A. L. R. 323. The wording of our statute is as general and unembellished as any considered in the cases following this majority rule. Nonetheless, our conclusion is sustained by such cases as Warnshuis v. State Bd. of Reg. in Medicine, 285 Mich. 699, 281 N. W. 410; State ex rel. Hathaway v. State Bd. of Health, 103 Mo. 22, 15 S. W. 322; Dilliard v. State Bd. of Medical Examiners, 69 Colo. 575, 196 P. 866; Aiton v. Board of Medical Examiners, 13 Ariz. 354, 114 P. 962, L. R. A. 1915A, 691.

The order of the board revoking the license of relator was unconditional. His conduct, while within the statute, does not seem to us to justify revocation of his license. We cannot escape the conclusion that a temporary suspension would have adequately served the need for discipline. What is thus written will not be misconstrued if it be taken as a recommendation of clemency. Our limited power of review does not permit us to go further. If clemency is extended to relator and he is readmitted to practice,

he will necessarily realize that he is on probation and will govern his future conduct accordingly.

Affirmed.

### AFTER REARGUMENT.

On November 7, 1941, the following opinion was filed:

STONE, JUSTICE.

Because of our feeling that a suspension of relator's license is as much by way of discipline as the facts warrant, and because it was not much argued earlier, we ordered reargument of the question whether this court has the power to modify the decision of the state board of veterinary medical examiners or to remand the matter for rehearing. Our conclusion is that we cannot do either. The board acted within its jurisdiction. We cannot say that it proceeded on other than a correct theory of law or that its action was arbitrary, fraudulent, oppressive, or unreasonable. State ex rel. Dybdal v. State Securities Comm. 145 Minn. 221, 176 N. W. 759. There has been suggestion that the board acted upon the theory that its only power was to revoke relator's license. Whether that be so or not we cannot determine. It is clear, however, that the power to revoke includes the power to suspend. It is a case where the greater includes the lesser. State Board of Dental Examiners v. Savelle, 90 Colo. 177, 8 P. (2d) 693, 82 A. L. R. 1176. All we can add to our former decision is that if the board acted on the assumption that it had no power to suspend it proceeded on an erroneous theory and should grant a rehearing.

So, in adhering to our former decision as to result, the affirmance and consequent remanding will be without prejudice to a petition to the board of veterinary medical examiners for a rehearing, so that if, perchance, the board has acted thus far under assumption that it had power only to revoke, it can reconsider the case in the light of what has just been said on the subject of its power to suspend.

With that qualification, we adhere to our former decision.