## Pennsylvania State Board of Medical Education and Licensure *v.* Ferry, Appellant.

Argued October 6, 1952. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, ARNOLD and GUNTHER, JJ.

*Ralph B. Umsted,* with him *Ralph S. Croskey* and *Croskey & Edwards,* for appellant.

*Elmer T. Bolla,* Deputy Attorney General, with him *Robert E. Woodside,* Attorney General, for appellee.

OPINION BY DITHRICH, J., January 20, 1953:

This is an appeal from the order of the Court of Common Pleas of Dauphin County which sustained the action of the State Board of Medical Education and Licensure revoking the license to practice medicine and surgery issued to appellant, Cornelius Thomas Ferry, September 6, 1905. It was charged that appellant, by aiding and abetting unlicensed persons in the practice of medicine, violated §12 of the Medical Practice Act of June 3, 1911, P. L. 639, as amended by the Act of July 19, 1935, P. L. 1329, 63 PS §410, which provides in part: "The Board of Medical Education and Licensure may . . . revoke . . . the right to practice medicine and surgery in this State for any or all of the following reasons, to wit: . . . the board may so act upon satisfactory proof of grossly unethical practice, or of any form of pretense which might induce citizens to become a prey to professional exploitation."

Charles Duff, a person having no license to practice medicine, was employed by appellant at a salary of $75 a week. Relative to the nature of his employment, the testimony—uncontradicted by appellant who introduced no evidence in his behalf—discloses the following.

At appellant's direction and, at times, in his presence, new patients calling at his office were taken into a room occupied by Duff. Following a patient's visit, Duff gave a slip of paper to Carrie Meehan, receptionist, file clerk and bookkeeper in appellant's office, on which were his handwritten notations of names of diseases or ailments and an indication as to whether the patient had made any payment. If a payment had been made, Duff gave the money directly to appellant when he was present; otherwise, he gave it to Mrs. Meehan, who in due course turned it over to appellant. Mrs. Meehan testified that on occasion as many as

seventy patients would call at appellant's office and that Duff would "handle" most of them. She further testified that she observed Duff, who had access to the drug room, handing medicines to each patient he saw.

Among those patients taken to Duff's room were Edward Boyajian and William J. Brazukas. Boyajian's testimony was that in November, 1949, a stomach ailment caused him to visit appellant's office. There he saw Duff, who he thought was a doctor. Duff took his blood pressure, X-rayed his stomach and, though he made no statement to the patient regarding the ailment, proposed to treat him for $150. Sixteen treatments, consisting of injections, were administered by Duff twice weekly until January, 1950. In addition, Duff furnished Boyajian with a bottle of liquid medicine each week. The results were unsatisfactory; however, Duff continued the treatment until March, 1950, at which time Boyajian, who had made a total payment to Duff of $291, was discharged. During the period of treatment the patient was examined once by appellant.

Brazukas, who was deaf and dumb, testified, through an interpreter, that in August, 1948, complaining of "stomach sickness," he was examined by Duff, who took his blood pressure, X-rayed and fluoroscoped his stomach and chest. Duff told him that he was suffering from "gall bladder trouble." The patient saw appellant in the office on that occasion but had no conversation with him. He was treated twice a week for about a year by Duff, who also furnished him with pills and ointment. Duff charged him $5 for each treatment. On August 18, 1949, he saw appellant, who immediately sent him to the hospital where he underwent an operation.

The Act of August 6, 1941, P. L. 903, 63 PS §401, amending the Medical Practice Act of 1911, defines

"medicine and surgery" as "the art and science having for their object the cure of diseases of, and the preservation of the health of, man, including all practice of the healing art with or without drugs," and defines "healing art" as "the science of diagnosis and treatment in any manner whatsoever of disease or any ailment of the human body."[1]

In our opinion the testimony we have summarized contains substantial evidence[2] supporting the Board's finding that Charles Duff made diagnoses and administered treatments and medicines; its ultimate finding, which squares with the statutory definitions quoted, supra, that he practiced medicine;[3] and its additional finding that Duff's unlawful practice was aided and abetted[4] by appellant.

---

[1] Cf. *Commonwealth v. Seibert*, 262 Pa. 345, 105 A. 507; *Commonwealth v. Long*, 100 Pa. Superior Ct. 150.

[2] Section 44 of the Administrative Agency Law of June 4, 1945, P. L. 1388, 71 PS §1710.44, provides, inter alia: "After hearing, the court shall affirm the adjudication unless it shall find . . . that any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence." In *Pennsylvania State Bd. of Med. Ed., etc., v. Schireson*, 360 Pa. 129, 133, 61 A. 2d 343, the Court defined "substantial evidence" as being " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion' " and must be " 'more than a mere scintilla.' "

[3] On November 8, 1951, in the Court of Quarter Sessions of Philadelphia County, December Sessions, 1950, Nos. 1303, 1392 and 1393, Duff was found guilty by a jury on three counts of practicing medicine and surgery without a license and was sentenced to pay a fine of $500 and costs.

[4] ". . . the words 'aid' and 'abet' are commonplace words, the meaning of which is well understood; and it is held that the legal definition thereof is no different from their meaning in common parlance . . . [T]he word 'aid' means to assist, to supplement the efforts of another; whereas the word 'abet' includes the elements of knowledge of the wrongful purpose of the perpetrator and counsel and encouragement in the illegal act": *Anderson v. Board of*

"The most common statutory grounds for revocation or suspension of the license or certificate of a physician . . . are unprofessional, dishonorable, or immoral conduct": 70 C. J. S., Physicians and Surgeons, §17(b), p. 877. Aiding and abetting any unlicensed person to practice any system or mode of treating the sick or afflicted or employing unlicensed practitioners in the practice of medicine have by statute been deemed "unprofessional conduct" warranting revocation. *Rilcoff v. State Board of Medical Examiners,* 90 Cal. App. 2d 603, 203 P. 2d 844. But, it has also been regarded as such in the absence of statute. "Generally speaking, apart from, or in the absence of, statutory definitions, what constitutes unprofessional conduct . . . must be determined by those standards which are commonly accepted by those practicing the same profession in the same territory. In determining what constitutes dishonorable conduct every case must be determined on its own particular facts": 70 C. J. S., Physicians and Surgeons, §17(b), p. 878.

In *In Re Hughes v. State Board of Health,* 348 Mo. 1236, 1242, 159 S. W. 2d 277, 280, the Court said: "At the instigation and with the knowledge of respondent, Steinmeyer, though not a physician, received and examined patients in respondent's office, made diagnoses, determined the treatment, treated them and accepted fees from them for respondent. He would do this without any immediate supervision of respondent and at times when respondent was away from the office. Such acts of Steinmeyer constitute the practice of medicine. Practicing without a license is unlawful. When done at the command and with the knowl-

---

*Medical Examiners,* 117 Cal. App. 113, 115, 3 P. 2d 344. "The essential element of aiding and abetting the commission of any act is assisting and taking an active part in it": *Kendall v. Beiling,* 295 Ky. 782, 793, 175 S. W. 2d 489.

edge and aid of a physician, the latter is guilty of unprofessional conduct.[5] The very purpose of the act in protecting the public from untrained and incompetent persons is thereby violated by one who should be foremost in upholding it. See Dilliard v. State Board of Medical Examiners, 69 Colo. 575, 196 Pac. 866.''

The purpose of the Medical Practice Act of 1911, supra, is embodied in its preamble (63 PS §401, Historical Note), which states: ''. . . The safety of the citizens of this Commonwealth is endangered by incompetent physicians and surgeons, and a due regard for public health and the preservation of human life demands that none but competent and properly qualified physicians and surgeons shall be permitted to practice their profession.'' The Legislature has not said what conduct constitutes ''grossly unethical practice'' but the phrase is akin to the phrase ''unprofessional conduct''[6] and includes, as well stated by Judge SOHN of the court below, ''those breaches of the trust, confidence and reliance, necessarily attendant upon the intimate relationship of physician and patient, which amount to gross abuses of the standards of professional conduct generally recognized as essential to the proper practice of medicine and surgery''—to which we add—and which are within the scope of the pur-

---

[5] The Missouri statute authorized revocation of licenses of persons guilty of unprofessional conduct.

[6] In *Walker v. Corwin*, 210 Minn. 337, 300 N. W. 800, in construing the words ''gross moral or professional misconduct'' in a statute providing for the revocation of a veterinarian's license, the Supreme Court of Minnesota said (p. 801 of 300 N. W.): ''Complete certainty of definition is not required, especially where the attempt is to fix a standard of conduct, rather than to condemn specific acts. . . . The words in this statute must be understood to mean such activity as in the common judgment is deemed 'gross moral or professional misconduct.' ''

pose of the Act and within the limits of the police power. It cannot be doubted that appellant's conduct of aiding and abetting an unlicensed person in the unlawful practice of medicine, manifestly and flagrantly violative of the purpose of the Act, was "grossly unethical practice."

Having sustained the Board's finding that appellant was guilty of "grossly unethical practice," it is unnecessary that we determine whether the evidence warrants a finding that he was guilty of "any form of pretense," inasmuch as the statute is framed in the disjunctive. Nevertheless, we agree with the following statement of the learned judge of the court below: "By acquiescing in Duff's activities and, as a consequence, impliedly representing Duff to be licensed, Dr. Ferry was guilty of a pretense within the meaning of Section 12, and this pretense led to an exploitation of the people who visited the office of Dr. Ferry, in good faith, expecting to be treated by physicians under Dr. Ferry's control who were licensed by the Commonwealth of Pennsylvania. Instead the patients were subjected to treatment by an employee of Dr. Ferry, Charles Duff, whose qualifications were never subjected to the scrutiny of those authorized by the legislature to judge the competency of physicians."

Appellant argues that the only " 'substantial and legally credible evidence' . . . is the testimony of the last two-patient witnesses as to the taking of blood pressure and x-ray pictures." But the testimony is clear and uncontradicted that, in the case of William J. Brazukas, Duff not only made a diagnosis of "gall bladder trouble" but also performed a fluoroscopy. A skilled technician may take an X-ray, to be read by a physician, but only a skilled physician can perform a fluoroscopy, that is, observe processes going on in the living human body for diagnostic purposes.

Order affirmed.