**John W. GIDDINGS, Petitioner,**

v.

**STATE BOARD OF PSYCHOLOGY, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Nov. 17, 1995.

Decided Dec. 20, 1995.

**432**

Vincent J. Senko, for petitioner.

Jackie Wiest Lutz, for respondent.

Before McGINLEY and KELLEY, JJ., and NARICK, Senior Judge.

NARICK, Senior Judge.

John W. Giddings (Appellant) appeals from an order of the State Board of Psychology (Board) suspending Appellant's license to practice psychology until such time as Appellant demonstrated, to the satisfaction of the Board, that he was fit and competent to practice psychology under supervision. The Board also ordered that the active suspension of Appellant's license might be stayed in favor of a two-year period of probation if Appellant would submit to psychological evaluation and then undergo therapy, if such therapy were indicated, and if the evaluation were to show that Appellant was unfit, then his license would be suspended for at least one year, after which Appellant might obtain another evaluation. In either case, during this probationary period, Appellant's practice would be supervised by a psychologist approved by the Board.

The events leading up to this suspension/probation were as follows. Appellant, a licensed psychologist, received his Ph.D. from the University of Pittsburgh in 1971 and entered private practice in 1975. In 1975, Appellant was also teaching a class for Pennsylvania State University. In the Spring of 1975, an adult female, Ms. G.M., enrolled in a course taught by Appellant, and about mid-way through the course Ms. G.M. wrote a letter to Appellant informing him she was strongly attracted to him, and asking him whether she should drop the course because she was uncomfortable with this attraction. Appellant encouraged her to remain in the course.

After the course ended, in June, 1975, Ms. G.M. began therapy with Appellant. She wrote over one hundred (100) letters to Appellant during the time she was taking Appellant's course and was in therapy with him. These letters were amorous in tone and indicative of a person with an obsession. She also gave Appellant a scrapbook. In response, Appellant wrote approximately thirty-five letters to Ms. G.M., encouraging her to continue with therapy, but discouraging a more personal relationship. Ms. G.M. became very upset and threatened suicide. Appellant recommended that she see another therapist, but continued to treat her, and by September, 1976, Ms. G.M. was hospitalized because of her mental problems. Appellant knew at that time that she was emotionally dependent on him, actively seeking a personal, romantic relationship, and mentally unhealthy.

In the fall of 1976, after threatening to commit suicide if Appellant refused to treat her, Ms. G.M. resumed therapy with Appellant. At the end of 1976 or early 1977, Appellant and Ms. G.M. began a sexual relationship, which consisted of Appellant allowing Ms. G.M. to perform oral sex on him during the therapy sessions. This sexual relationship ended in mid–1978. Appellant charged Ms. G.M. for therapy sessions for a short time after the sexual relationship started, but then stopped charging her until the sexual relationship ended. Appellant ceased to provide therapy once the sexual relationship began, although Ms. G.M. had not shown improvement psychologically.

Appellant recalled that he broke off the relationship because it became too uncomfortable for him, after which Ms. G.M. consulted Drs. Wilson and Vancara. Dr. Wilson advised Appellant to go into therapy as a result of this relationship with his client. As a result, he underwent weekly therapy with Dr. Scott for six (6) months. He stated that he believed that the communications with Dr. Wilson were official communications, and that the therapy was required.

Eleven (11) years later, in 1991, Appellant discovered among his records the scrapbook Ms. G.M. had given him, and some of her letters. He returned the scrapbook but destroyed the letters, and on August 8, 1991, shortly after returning the scrapbook, Appel-

lant telephoned Ms. G.M. During this conversation, Appellant told Ms. G.M. that he had heard someone on a radio talk show whose voice sounded like hers, and who said she was involved with a priest. Appellant asked Ms. G.M. if she was the woman on the radio who was involved with a priest, and whether she would like to get together with him. A couple of weeks after this strange and disturbing conversation, on August 19, 1991, Appellant again called Ms. G.M., who asked him not to call back. Ms. G.M. was very disturbed by this renewed contact, and called her treating doctor and Dr. Vancara. Subsequently, she filed a complaint with the Bureau of Professional and Occupational Affairs (Bureau).

Another patient, Mr. R.S., also filed a complaint against Appellant. In 1991, Appellant began treating Mr. R.S. for depression caused by marital difficulties. This treatment was covered by the insurance carrier, and pursuant to the fee arrangement, Mr. R.S. paid $20.00 and his insurance company paid $15.00, the balance of Appellant's hourly fee. Mr. R.S.'s wife was also in therapy with Appellant. In March, 1991, Mr. R.S. changed jobs, and his new medical insurance did not cover Mrs. R.S. In October, 1991, Appellant submitted a bill to Mr. R.S. for $240.00, although Mr. R.S. believed that the fee arrangement with Appellant would continue as before. Appellant also instructed Mr. R.S. to sign blank insurance forms to cover the therapy for Mrs. R.S. The Board found, as regards Mr. R.S., that Appellant had violated Section 8(a)(9) of the Professional Psychologists Practice Act (Act)[1] by violating a lawful regulation promulgated by the Board. The regulation violated, 49 Pa.Code § 41.61, which is Principle 6(f) of the Code of Ethics, provides in pertinent part that financial arrangements in professional practice must be clearly understood by the client in advance of billing. The Board also found that Appellant violated Section 8(a)(11) of the Act, 63 P.S. § 1208(11), engaging in unprofessional conduct in regard to Mr. R.S.

■ Appellant first argues, regarding Ms. G.M., that the Board erred in its interpretation of the psychologist's ethical code which was in effect at the time of the alleged violation. Appellant states that in 1976, when the sexual relationship began, there was no official prohibition against sexual intimacies with clients, but in early 1978, before the sexual relationship ended, the Board adopted a new Code of Ethics which stated in Principle 6, section (b), 49 Pa.Code § 41.61, that sexual intimacies with clients are unethical. Appellant argues that by the time Principle 6 was adopted, a psychologist-client relationship had ceased to exist, rather it changed into a sexual relationship, and as Ms. G.M. testified, Appellant, after the first eight sessions of oral sex, ceased to charge Ms. G.M. a fee for therapy. Therefore, Appellant argues, in 1978, Ms. G.M. was no longer a client, and there was no violation of the ethical principal that was adopted that year.

■ We strongly reject this argument, because we would be undermining the professional ethical scheme which strongly condemns this conduct. In effect we would be condoning a policy in which all a psychologist need do to avoid disciplinary measures for conduct which violates the Act and the Code of Ethics, is to terminate therapy, and stop charging a fee, but continue the prohibited conduct. Although this is a case of first impression, we hold that a psychologist who, during the course of the therapeutic relationship, engages in sexual intimacies with a client may not absolve himself or herself from professional liability by ceasing to provide therapy while the sexual relationship continues.

■ Moreover, there is no evidence that Appellant ever formally terminated the therapeutic relationship. Rather, it seems to have gradually become a sexual relationship, with no thought on Appellant's part to Ms. G.M.'s psychological health or her continued need for therapy. Indeed, Appellant admitted that Ms. G.M. was no better psychologically at the time the sexual intimacy began. (R.R. 378a.) As the Board notes, citing, Clifford D. Stromber et al., *The Psychologist's Legal Handbook*, 493 (1988), the therapist must take certain steps before terminat-

---

1. Act of March 23, 1972, P.L. 136, *as amended,* 63 P.S. § 1208(a)(9).

ing a therapeutic relationship with a patient. At the very least, he must have a discussion with the patient about whatever additional assistance is necessary and about appropriate providers of the needed services. There is no evidence in the record that Appellant ever discussed termination prior to starting a sexual relationship with her, and no evidence that, even knowing that his patient was still ill, he discussed additional assistance or alternative therapists. Instead, after discontinuing therapy he simply started a sexual relationship, in the same place and on the same terms as the former therapeutic relationship.

Our review of the Board's decision is limited to a determination of whether constitutional rights have been violated, whether an error of law has been committed, and whether necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704. Appellant admits that he engaged in sexual conduct with Ms. G.M. between September, 1976 and August, 1978. Although there was no official prohibition against sexual intimacies with clients in 1976 when the sexual relations began, such a prohibition was in full force and effect as of March 18, 1978. Appellant was thus on notice as of March 18, 1978 that sexual intimacies with clients, and relationships with clients which might increase the risk of client exploitation were prohibited. Nevertheless, Appellant continued to engage in such conduct for five additional months. We therefore hold that there is substantial evidence to support the Board's findings that Appellant's conduct was violative of Section 8(4) of the Act, by and through his violation of Principle 6 of the Ethics Code.

■ Next, Appellant argues that the Board's findings that he violated the Ethical Code by engaging in sexual intimacies with Ms. G.M. is barred by the application of the equitable doctrine of laches. Our Supreme Court has held:

'The application of the equitable doctrine of laches does not depend upon the fact that a definite time has elapsed since the cause of action accrued, but whether, under the circumstances of the particular case, the complaining party is guilty of want of due diligence in failing to institute his action to another's prejudice.' *Class of Two Hundred Administrative Faculty Members v. Scanlon,* 502 Pa. 275, 279, 466 A.2d 103 (1983). The prejudice required is established where, for example, witnesses die or become unavailable, records are lost or destroyed, and changes in position occur due to the anticipation that a party will not pursue a particular claim. [Citations omitted.]

Thus, it is clear that the application of the defense of laches requires not only an unjustifiable delay, but also that the opposing party's position or rights be prejudiced as a result of that delay. [Citations omitted.]

*Weinberg v. Pennsylvania State Board of Examiners of Public Accountants,* 509 Pa. 143, 501 A.2d 239 (1985).

Appellant argues that the delay in bringing charges against him was grossly unreasonable,[2] and that he has been severely prejudiced in his ability to defend against these charges because of this delay. He cites the loss or destruction of case notes, client notes and files, the inability to secure the testimony, notes, or files of witnesses to events occurring at the time of the alleged incidents, and the unavailability of the notes taken during therapy.

■ The Board held that Appellant is precluded from asserting laches because he does not assert this equitable doctrine with clean hands. We agree. The doctrine of clean hands is grounded in the historical notion of a court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith, and thus any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for closing the doors of a court of equity to one

---

**2.** By his own admission, the sexual intimacies giving rise to the ethical violations did not end until August of 1978. The Commonwealth's charges were filed on December 30, 1992. Therefore, the length of time between the termination of the sexual conduct and Ms. G.M.'s complaint was 14 years, not the 17 years alleged by Appellant.

tainted with inequitableness. *Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945); *In re Estate of Pedrick*, 505 Pa. 530, 482 A.2d 215 (1984). The clean hands doctrine does not bar relief to a party merely because his conduct in general is blameworthy; the doctrine only applies where the wrongdoing directly affects the relationship subsisting between the parties and is directly connected to the matter in controversy. *Estate of Pedrick.*

Here, Appellant attempts to invoke the equitable doctrine of laches when it was his own unconscionable conduct, in attempting to re-establish contact with Ms. G.M. in 1991, which prompted her complaint to the Board at such a late date. The record shows that Appellant knew that his former relationship with Ms. G.M. caused her great pain, that her feelings for him were characteristic of someone with an obsession, and yet despite Ms. G.M.'s fragile state of mind, her obsession, and his own complicity in an unethical sexual relationship, Appellant very consciously re-entered Ms. G.M.'s life in 1991, and suggested that they get together. This wrongdoing directly affected the relationship subsisting between the parties and is directly connected to the matter in controversy. Thus, this attempt by Appellant, who as a psychologist was trained to understand the emotional effect of his behavior, to re-establish a relationship under these circumstances with a woman with whom he had improper sexual relations, is sufficient cause to bar the invocation of the doctrine of laches in this case.

■ Finally, Appellant argues that the Bureau failed to sustain its burden of proof to show that he committed unprofessional conduct, which includes any departure from, or failure to conform to, the standards of acceptable and prevailing psychological practice, in violation of Section 8(a)(11) of the Act.[3] He claims that because the Bureau failed to show that he had submitted the blank insurance forms for sessions with Mrs. R.S. to the insurance carrier for Mr. R.S.,

the Bureau failed to prove that he had conducted himself unprofessionally in this matter. We disagree.

The record shows that Appellant admitted to asking Mr. R.S. to sign at least one insurance form with the intent to acquire payment for treatment of Mrs. R.S., who was not covered by her husband's insurance. We have held that although the term "professional conduct" fails on its face to provide a standard by which conduct can be uniformly judged, this type of language may be interpreted in the context of the common knowledge and understanding of members of a particular profession, in order to determine the term's specific meaning. *Stephens v. Pennsylvania State Board of Nursing*, 657 A.2d 71 (Pa.Cmwlth.1995), *appeal denied*, —— Pa. ——, 664 A.2d 978 (1995). When considered within the context of the common knowledge and practices of psychologists throughout the Commonwealth and elsewhere, there can be no doubt that Appellant acted unprofessionally when he attempted to bill for services which were not rendered to Mr. R.S. but to his wife. Therefore he violated section 8(a)(11) of the Act.

Accordingly, we affirm the order of the Board in its entirety.

### *ORDER*

AND NOW, this 20th day of December, 1995, the order of the State Board of Psychology in the above-captioned matter is hereby affirmed.

---

**3.** 63 P.S. § 1208(a)(11). At oral argument before this Court, Appellant's attorney advised that he was withdrawing the fourth argument raised in his brief, i.e., that Appellant was denied his due process rights because of commingling of prosecutorial and adjudicatory functions.