**Robert STARR, M.D., Petitioner,**

v.

**STATE BOARD OF MEDICINE, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Sept. 15, 1998.

Decided Nov. 4, 1998.

Charles I. Artz, Harrisburg, for petitioner.

Gerald S. Smith, Harrisburg, for respondent.

Before McGINLEY and SMITH, JJ., and JIULIANTE, Senior Judge.

JIULIANTE, Senior Judge.

Robert T. Starr, M.D. (Starr), petitions for review from the October 27, 1997 decision of the State Board of Medicine (Board) ordering that his license to practice medicine in Pennsylvania be revoked, effective immediately. For the reasons that follow, we affirm.

Starr received his medical license from the West Virginia University Medical School in 1989. (Finding of Fact "F.F." No. 3). He completed his residency program in psychiatry at St. Francis Health Systems hospitals in Pittsburgh and New Castle, Pennsylvania. (*Id.*) Starr received his license to practice medicine in Pennsylvania on August 12, 1991, and is board-certified in psychiatry and neurology (F.F.Nos. 1, 3). From August 1991 to June 1995, Starr was employed as a consulting psychiatrist at the Lawrence County Human Service Center (LCHSC) in New Castle. (F.F.No. 5).[1] Additionally, since July 1, 1993, Starr was on the staff of St. Francis Hospital in New Castle. (F.F. No. 4).

On December 19, 1996, the Commonwealth Bureau of Professional and Occupational Affairs (Bureau) filed an Order to Show Cause with the Board charging that Starr violated Sections 41(8) and (9) of the Medical Practice Act (the Act),[2] by engaging in immoral, unethical, and unprofessional conduct. (Certified Record "C.R." at 1a–14a).[3] Specifically,

---

1. The Board's finding states that Starr was employed at LCHSC until June of 1996; however, Starr testified that his employment with LCHSC terminated in June of 1995. We view this as a typographical error.

2. Act of December 20, 1985, P.L. 457, *as amended*, 63 P.S. § 422.41 (8) and (9).

3. On October 31, 1996, the Board notified Starr that it suspended his license retroactive to October 22, 1996.

the Bureau charged that Starr engaged in romantic and sexual relations with his psychiatric patients. Starr filed an answer to the allegations (C.R. Vol. I at 15a–26a, 27a–32a) and formal hearings were conducted before the Board hearing examiner on March 20 and 21, 1997.

The hearing examiner issued his adjudication and order on April 27, 1997, finding that Starr violated Sections 41(8) and (9) of the Act. Accordingly, the hearing examiner ordered that Starr's license to practice medicine be revoked.

Starr appealed, and on October 21, 1997, the Board revoked Starr's license.[4] This appeal followed.

Starr raises three issues for our review: (1) whether the application of a *per se* rule that is not authorized by the Act, the Board's regulations, or case law violates what is commonly called the Commonwealth Documents Law;[5] (2) whether Starr engaged in consensual sexual relations with former patients only after the physician-patient relationships ended; and (3) whether the Board's action violated the Equal Rights Amendment of the Pennsylvania Constitution or alternatively, was excessively harsh. Our scope of review is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether the necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704; *Firman v. Department of State, State Board of Medicine*, 697 A.2d 291 (Pa.Cmwlth.1997), *petition for allowance of appeal denied*, 550 Pa. 722, 706 A.2d 1215 (1998).

The Board based its decision to revoke Starr's license on the following facts: In the fall of 1994, S.E.[6] became one of Starr's patients at LCHSC. (F.F. No. 17). Her first appointment with Starr was around Thanksgiving of that year and her appointments were scheduled at two-week intervals.

(F.F.Nos. 19, 20). Starr treated S.E. for depression, and generally asked about her personal life, including the fact that she was a recovering alcoholic. (F.F.Nos. 21, 22). During S.E.'s sessions, Starr began discussing his personal life with her, and sometime before Christmas 1994, he asked to see her socially. (F.F.Nos. 23, 24). Thereafter, Starr telephoned S.E. at her home and asked her to meet him at a local restaurant. (F.F. No. 25). After their meeting, Starr began visiting S.E. at her home, usually after 11:00 p.m., and sometimes spent the night there. (F.F. No. 26). During these visits, S.E. and Starr would engage in sexual intercourse. (F.F. No. 27). This relationship continued for approximately six-months to a year. (F.F. No. 29).

After the sexual aspect of their relationship began, S.E. informed Starr that another counselor had informed her that it was unethical for Starr to engage in relations with her. (F.F. No. 30). Although Starr replied that he would refer her to another physician, he never did. (*Id.*). During their sexual relationship, Starr continued to write prescriptions for S.E. for anti-depressant medication. (F.F. No. 32).

T.T. is a divorced mother of two, and she first met Starr when he treated her in his private practice. (F.F.Nos. 33, 34). T.T. also treated with Starr for depression, given the fact that she was experiencing difficulties at work and that her husband had left the marital residence. (F.F.Nos. 35, 36). At the time of her first visit, T.T. was on medical leave from her position with the United States Post Office, and Starr wrote orders allowing her to continue on medical leave. (F.F.Nos. 37, 38). In October of 1994, Starr telephoned T.T. at her home and proceeded to flirt with her, indicating that he had checked into a motel room that had a waterbed. (F.F. No. 39). During the first office visit in November 1994, Starr asked T.T. if

---

**4.** The hearing examiner based his findings of fact and conclusions of law on the testimony of three complaining witnesses. However, when the Board examined the record, it found that the record only supported the findings of fact with regard to two of the three complaining witnesses. The Board did not appeal this determination.

**5.** Act of July 31, 1968, P.L. 769, *as amended*, 45 P.S. §§ 1102–1602.

**6.** The initials of the complaining witnesses were used to protect their privacy.

she would accompany him on a trip to Boston. (F.F. No. 40). Starr continued to call T.T., and eventually T.T. briefly visited Starr at his apartment. (F.F.Nos. 41, 42).

T.T. then visited Starr again at his apartment in December 1994, at which time she inquired whether it was proper for a physician to date a patient. (F.F. No. 44). Starr replied that it was allowable so long as he was not sleeping with the patient, and then he made a joke that T.T.'s file had disappeared. (*Id.*). Also at this time, Starr told T.T. that he loved her and that he wanted to marry her. (F.F. No. 45). The two then engaged in sexual intercourse, oral sex, and kissing. (F.F. No. 47). In early December, Starr referred T.T. to another physician; however, he told her not to inform the physician why she was changing doctors. (F.F. No. 46). Starr and T.T. continued to have a sexual relationship until November of 1995, and were even engaged for a brief time in October of 1995. (F.F. No. 48).

Starr testified on his own behalf, admitting that he engaged in sexual relations with both S.E. and T.T. However, he testified that both women pursued him and that he only engaged in consensual sexual relations with them after he terminated the physician-patient relationship. He stated that the last office visit he had with S.E. was on December 14, 1994, nearly a month before they engaged in sexual intercourse. With respect to T.T., he admitted that theirs was a tumultuous relationship, and stated that T.T.'s testimony was that of a vindictive woman scorned by the break-up of their engagement.[7]

Sections 41(8) and (9) of the Act state that the Board shall have the authority to impose disciplinary or corrective measures on a board-regulated practitioner for

(8) Being guilty of immoral or unprofessional conduct. Unprofessional conduct shall include departure from or failing to conform to an ethical or quality standard of the profession. In proceedings based on this paragraph, actual injury to a patient need not be established.

(i) The ethical standards of a profession are those ethical tenets which are embraced by the professional community in this Commonwealth.

(ii) A practitioner departs from, or fails to conform to, a quality standard of the profession when the practitioner provides a medical service at a level beneath the accepted standard of care. The board may promulgate regulations which define the accepted standard of care. In the event the board has not promulgated an applicable regulation, the accepted standard of care for a practitioner is that which would be normally exercised by the average professional of the same kind in this Commonwealth under the circumstances, including locality and whether the practitioner is or purports to be a specialist in the area.

(9) Acting in such manner as to present an immediate and clear danger to public health or safety.

63 P.S. § 422.41 (8) and (9).

## I.

■ In his first argument on appeal, Starr maintains that the Board erroneously applied a *per se* rule requiring the revocation of a professional license for sexual misconduct which violates the Commonwealth Documents Law. We disagree.

Section 201 of the Law provides that an agency shall give public notice of its intention to promulgate, amend or repeal any administrative regulation.[8] The Law further provides that the agency, if required, shall hold public hearings on the matter and review and consider any written comments [9] and that the adopted regulations be approved by the Department of Justice before they are deposited with the Legislative Reference Bureau.[10]

In support of his position that a directive had been issued by the Board, Starr submitted a memorandum (memo) appearing on

---

7. Starr additionally presented the testimony of several co-workers and friends who testified that they witnessed T.T. harass Starr at work and socially.

8. Section 201 of the Law, 45 P.S. § 1201.

9. Section 202 of the Law, 45 P.S. § 1202.

10. Section 205 of the Law, 45 P.S. § 1205.

Department of State letterhead, a newspaper article, and a letter written by Bureau Commissioner Dorothy Childress. (C.R. Vol. II at 493a–496a).[11] Starr maintains that these documents established a directive that provides for the revocation of a practitioner's license should he or she engage in sexual relations with a patient.

The memo resulted from a joint session of various health boards convened April 25–26, 1996 to address, among other concerns, professional sexual misconduct. The first portion of the memo summarized the joint session and included general information regarding its purpose, participants, and goals. Part two of the memo, under the heading of "Findings," stated that

[a]ny policy based on reliable scientific evidence must, at a minimum, reflect the following criteria:

- Sexual behavior occurring during the course of any doctor-patient or therapist-patient relationship is never justified and represents a breach of the professional's fiduciary duty to the patient. Such behavior should result in revocation. Consent should not be recognized as a defense.

- Post-treatment sexual relations between a mental health professional and a former patient are deemed to be potentially harmful in perpetuity. Once again, consent cannot be raised as a defense.

- Post-treatment sexual relations between a non-psychotherapist health care professional and a former patient may be permissible under limited circumstances.

- Evidence of a patient's sexual history should always be inadmissible since consent is never an issue; the responsibility to avoid sexual intimacy cannot be shifted from the professional to the patient.

- Rehabilitation of sexually exploitative health care professionals is never likely to occur; informed consent to safe treat-

ment should involve full disclosure of any past sexual misconduct.

(C.R. Vol. II at 493a). The memo appeared on Department of State letterhead and did not indicate its author. (*Id.*).

The newspaper article, appearing in the April 27, 1996 issue of the Harrisburg Patriot–News, informed the public that the joint session was held and provided statistics relating to professional misconduct cases. (C.R. Vol. II at 494a). The article does not attribute any information contained therein to Commissioner Childress.

Finally, Starr introduced a June 3, 1996 letter written by Commissioner Childress addressed to physicians generally. The letter summarized the purpose of the joint session, identified its goals, and cited to statistics regarding the rise in the number of sexual misconduct investigations since 1990. Specifically, Starr cites to that sentence in the Commissioner's letter that stated "[w]e also feel that the information exchanged will assist in our efforts to continue aggressive prosecution and better define standards of conduct." (C.R. Vol. II at 495a).

Starr argues that these documents constitute a directive, or substantive rule, issued by Commissioner Childress rather than a policy statement issued by the Board. We disagree.

In *Pennsylvania Human Relations Commission v. Norristown Area School District*, 473 Pa. 334, 374 A.2d 671 (1977), our Supreme Court favorably cited to the District of Columbia Court of Appeals' decision in *Pacific Gas & Elec. Co. v. Federal Power Commission*, 506 F.2d 33 (D.C.Cir.1974). In *Norristown*, our Supreme Court adopted the District Court's distinction between a substantive rule that must be promulgated through rule-making procedures and statements of policy that require no such proceedings.

An administrative agency has available two methods for formulating policy that will

11. These documents were first attached to a motion to remove Commissioner Childress and any other members of the Board that might have prejudged the matter. Starr uses them throughout his brief to substantiate his claim that the

Board and/or Commissioner Childress issued a directive requiring that any individual that engages in sexual relations with patients shall have his/her license revoked.

have the force of law. An agency may establish binding policy through rulemaking procedures by which it promulgates substantive rules, or through adjudications which constitute binding precedents. A general statement of policy is the outcome of neither a rulemaking nor an adjudication; it is neither a rule nor a precedent but is merely an announcement to the public of the policy which the agency hopes to implement in future rulemakings or adjudications. A general statement of policy, like a press release, presages an upcoming rulemaking or announces the course which the agency intends to follow in future adjudications.

. . . .

The critical distinction between a substantive rule and a general statement of policy is the different practical effect that these two types of pronouncements have in subsequent administrative proceedings.... A properly adopted substantive rule establishes a standard of conduct which has the force of law.... The underlying policy embodied in the rule is not generally subject to challenge before the agency.

A general statement of policy, on the other hand, does not establish a 'binding norm'.... A policy statement announces the agency's tentative intentions for the future. When the agency applies the policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued.

*Norristown Area School District,* 473 Pa. at 349, 374 A.2d at 679 (quoting *Pacific Gas & Elec. Co. v. Federal Power Commission,* 506 F.2d 33, 38 (D.C.Cir.1974)).

In the present case, the documents submitted by Starr fail to convince us that the Board issued a directive, or substantive rule, addressing professional sexual misconduct in violation of the Law. First, the Board's October 21, 1997 order revoking Starr's license does not mention, quote, or reference the memo or Commissioner Childress' June 3, 1996 letter. Indeed, the Board's decision is based solely on its interpretation of "unpro-

fessional conduct" under Section 41(8) of the Act. (C.R. Vol. II at 511a, 516a–518a).

Second, the unsigned memo and Commissioner Childress' June 3, 1996 letter cannot be described as "Board actions resulting in a substantive rule." While we recognize that evidentiary rules are relaxed in administrative proceedings, we must also recognize that Starr failed to lay any foundation indicating that the Board authored, approved of, or implemented the suggestions contained within the documents. Starr failed to establish that the challenged pronouncements left the Board unable to exercise its discretion to follow or not follow the suggested policy in any individual case.

And third, a fair reading of both documents clearly establishes that they are summaries of the April 25–26, 1996 joint session. The language of both the memo and the letter indicates that the suggestions contained therein are policies that should be formally adopted at some future point in time. Again, the memo states *"[a]ny policy based on scientific evidence must, at a minimum, reflect the following criteria"* and Commissioner Childress' letter closes with the following remarks: "Beginning next month, members of our staff will begin meeting with affected health boards for *the purpose of working towards the adoption of an appropriate professional licensure policy* in cases involving sexual misconduct by health practitioners." (C.R. Vol. II at 493a, 496a)(emphasis added). These statements recognize that there is no policy in place.

Accordingly, we conclude that the documents presented do not establish that the Board issued a directive, or substantive rule, in violation of the Commonwealth Documents Law.

## II.

Next, Starr maintains that neither the Act nor any appellate case law prohibits consensual sexual relationships with former patients. The underlying basis of his argument is that since the physician-patient relationships ended prior to the commencement of any sexual relationships with S.E. and T.T,

the Board should not have revoked his license.

a. *Sexual intercourse with former patients*

Starr cites this Court to *Catena v. State Board of Medical Education and Licensure,* 49 Pa.Cmwlth. 542, 411 A.2d 869 (1980) and *Pennsylvania State Board of Medical Education and Licensure v. Ferry,* 172 Pa.Super. 372, 94 A.2d 121 (1953) for the proposition that the unprofessional conduct must occur during the physician-patient relationship in order to be subject to discipline.[12] While instructive, these cases do not further Starr's position.

In *Catena,* petitioner's license to practice medicine was suspended for six months for two separate allegations of misconduct, one of them being Medicare fraud. Petitioner argued that his conviction for Medicare fraud did not constitute violations of Sections 15(a)(2) and (8) of the Act, relating to misleading, deceptive, untrue and fraudulent representation and unprofessional conduct, respectively.[13]

In addressing whether Medicare fraud was "unprofessional conduct" under Section 15(a)(8), we noted that that section seemed to be limited to conduct occurring during the course of the physician-patient relationship. In *Catena,* we relied heavily on the definition of "unprofessional conduct" appearing in Section 15(a)(8) of the Act.[14] Our holding, however, was limited to incidents of Medicare fraud. We specifically declined to identify what "unprofessional conduct" would be in all cases.

In *State Board of Medical Education and Licensure v. Ferry,* Cornelius Ferry appealed the Board's revocation of his medical license. The Board concluded that Ferry aided and abetted an unlicensed individual in the practice of medicine and, therefore, revoked his license.

At the time that Ferry's license was revoked, the Act provided that the Board could revoke a physician's license if it found that the physician had engaged in "grossly unethical conduct."[15] However, as here, the Legislature did not define "grossly unethical conduct." In *Ferry,* the Superior Court likened the term to "unprofessional conduct." The Court went on to define "unprofessional conduct" to include "those breaches of trust, confidence and reliance, necessarily attendant upon the intimate relationship of physician and patient, which amount to gross abuses of the standards of professional conduct generally recognized as essential to the proper practice of medicine and surgery." *Ferry,* 94 A.2d at 124.

Starr maintains that he terminated the physician-patient relationships with S.E. and T.T. before engaging in sexual relations with them. Again, neither the Act nor the Board's regulations instruct a physician as to how to terminate the physician-patient relationship.

In reference to the psychologist-patient relationship, we stated that

the therapist must take certain steps before terminating a therapeutic relationship with a patient. At the very least, he must have a discussion with the patient about whatever additional assistance is necessary

12. Starr also cites to *Schireson v. Shafer,* 354 Pa. 458, 47 A.2d 665 (1946) for the proposition that "unethical conduct" as used in the statute must be limited to the physician-patient relationship. However, our reading of that case does not support Starr's interpretation. The main issue in *Schireson* was whether the Board could revoke Schireson's medical license on the basis of fraud when the statute allowing the Board to revoke licenses did not become effective until after his license was issued. *Schireson* did not address unethical conduct as it applied to the physician-patient relationship.

13. This definition is now found in Section 41 of the Act. The Act was first enacted as the Act of June 3, 1911, P.L. 639. Under that Act, Section

12 delineated the conduct that was subject to disciplinary or corrective measures. The Act of July 20, 1974, P.L. 551, renumbered Section 12 to 15, and this Section was in effect at the time that the Board revoked Catena's medical license. The Act of 1974 was repealed by the Act of December 20, 1985, P.L. 457, the current version of the Act.

14. The language of Section 15(a)(8) did not change with the 1985 amendments to the Act.

15. Section 12 of the Act of June 3, 1911, P.L. 639, repealed by the Act of July 20, 1974, P.L. 551. Substantially similar language now appears in Section 41 of the Act, 63 P.S. § 422.41.

and about appropriate providers of the needed services.

*Giddings v. State Board of Psychology,* 669 A.2d 431, 433–434 (Pa.Cmwlth.1995).

In the present matter, S.E. testified that she questioned Starr regarding their personal relationship, that he told her that he would refer her to another physician, and that he did not follow through on his word. (F.F. No. 30). S.E. further testified that Starr prescribed anti-depressant medication for her *during the course of their sexual relationship.* (F.F. No. 32).

T.T. likewise testified that she questioned Starr about physicians and patients engaging in personal relationships. According to T.T., Starr responded by making a joke about her file disappearing. (F.F.No. 44). Starr eventually referred T.T. to another physician and then the sexual aspect of their relationship began. (F.F. No. 46, 47).

While it is true that T.T. and Starr did not engage in sexual relations until after T.T. was referred to another physician, Starr fails to acknowledge that the foundations of his relationships with S.E. and T.T. began during the course of their physician-patient relationships. During these sessions, Starr revealed personal information, showed affection toward the complainants, and made suggestions to them indicating his desire to see them socially. Within a month of undertaking S.E. and T.T. as clients, Starr began telephoning them at their homes and discussing his personal interest in them. Additionally, although T.T. did not engage in sexual intercourse with Starr while he was her physician, the two engaged in other types of physical contact, such as kissing. Undoubtedly, all this occurred during the physician-patient relationship.

■ Starr attempts to draw a bright line that would condone his conduct. However, it is abundantly clear that these relationships began during the course of the physician-patient relationships and resulted only from those relationships. It is also clear that

Starr attempted to terminate the relationships so that he could pursue S.E. and T.T. socially. The complainants were in a delicate state of mind, which as a physician Starr should have respected. Starr should have known that they could be easily persuaded *and he should have adhered to his responsibility to help them overcome their problems* without engaging them in personal relationships. Thus, we agree with the Board's rejection of Starr's argument that he engaged in consensual sexual relationships only with former patients and therefore, did not violate the Act.

■ The Act provides that a practitioner may be disciplined for "immoral or unprofessional conduct." Section 41(8) of the Act, 63 P.S. § 422.41 (8). Although the Act and the Board's regulations do not delineate conduct that is unprofessional, the Act does provide that unprofessional conduct includes the departure from or the failure to conform to an ethical or quality standard of the profession. *Id.* In addition, the Act further provides that where the Board has not promulgated an applicable regulation, the practitioner is held to the standard of care normally exercised in this Commonwealth. *Id.* An administrative agency's interpretation of a statute for which it has enforcement responsibility is entitled to substantial deference, *Borough of Pottstown v. Pennsylvania Municipal Retirement Board,* 551 Pa. 605, 712 A.2d 741 (1998), and thus, we conclude that the Board is entitled to deference in its determination of what constitutes "unprofessional conduct."

*b. The burden of proof*

Next, Starr maintains that the Board applied the wrong burden of proof. The hearing examiner applied the preponderance of the evidence standard.[16] (C.R. Vol. II at 469a). However, Starr cites to *State Board of Medical Education and Licensure v. Grumbles,* 22 Pa.Cmwlth. 74, 347 A.2d 782 (1975) for the proposition that the correct burden of proof is the clear and satisfactory

---

16. The hearing examiner cited our decision in *Lyness v. State Board of Medicine,* 127 Pa. Cmwlth. 225, 561 A.2d 362 (1989), *rev'd on other grounds,* 529 Pa. 535, 605 A.2d 1204 (1992). Our decision in *Lyness,* however, did not state

that the proper burden of proof was the preponderance of the evidence. Rather, it merely stated that those cases cited by Lyness did not establish that the Board must prove its case beyond a reasonable doubt.

test. Starr's reliance on *Grumbles* is misplaced.

■ In *Grumbles,* this Court set aside the Board's order on the grounds that the adjudication was "not supported by substantial evidence much less the clear and satisfactory evidence necessary to support charges of unprofessional conduct." *Id.* 347 A.2d at 785. *Grumbles* cited to *In re Shigon,* 462 Pa. 1, 329 A.2d 235 (1974) for the burden of proof. *In re Shigon* involved allegations that several members of the Philadelphia bar had illegally solicited lawsuits. In addressing whether the evidence supported a finding of unprofessional conduct, the Supreme Court stated that the "misconduct must be shown by a preponderance of the evidence, which 'should be clear and satisfactory,' but may include logical inferences as well as direct proof." *Id.* at 17, 329 A.2d at 243 (citing *Krehel Appeal,* 419 Pa. 86, 89, 213 A.2d 375, 377 (1965)). Thus, tracing the origin of the phrase "clear and satisfactory," it is evident that the phrase was used to modify "preponderance of the evidence" and is not, itself, the correct burden of proof.

*c. Starr's right to due process*

Next, Starr maintains that the Board violated his right to due process when it refused to compel the prosecution to turn over its investigative file. The Board denied Starr's request to view and copy the prosecution's file, citing what is commonly called the Right to Know Law.[17]

■ The essential elements of due process are notice and opportunity to be heard and to defend oneself in an orderly proceeding adapted to the nature of the case before a tribunal having jurisdiction over the matter. *Soja v. Pennsylvania State Police,* 500 Pa. 188, 193, 455 A.2d 613, 615 (1982). Due process also requires an opportunity to confront and cross-examine adverse witnesses. *Id.* These requirements are fully applicable to adjudicative hearings involving substantial property rights before administrative tribunals. *Lewis v. School District of Philadel-*

phia, 690 A.2d 814, 816–817 (Pa.Cmwlth. 1997).

Starr argues that this case should be controlled by the Superior Court's decision in *Commonwealth v. Kauffman,* 413 Pa.Super. 527, 605 A.2d 1243 (1992), wherein the Court held that the Right to Know Law did not apply to discovery proceedings under the Pennsylvania Rules of Civil Procedure.

In *Kauffman,* Gary Kauffman was found guilty of indecent assault and corruption of a minor. Thereafter, the victim's parents initiated a civil lawsuit against Kauffman and others. As part of the civil proceedings, the trial court entered an order directing the District Attorney to provide, *in camera,* its files pertaining to Kauffman so that the court could supervise discovery in the civil action.

On appeal to the Superior Court, the District Attorney argued that discovery of the information contained in its file was barred by the Right to Know Law. The *Kauffman* Court rejected the District Attorney's argument, basing its decision, in part, on the fact that the Legislature, by excluding certain documents from public inspection, did not intend to bar the use of such information in judicial proceedings. Accordingly, the Superior Court held that the Right to Know Law does not bar a party in a civil action from discovering relevant information from the files of a government agency. *Kauffman,* 605 A.2d at 1243.

However, this case is factually distinguishable. In *Kauffman,* the victim's parents brought a separate legal action against Kauffman for damages after Kauffman's criminal conviction. Here, the only action pending was the Board's disciplinary proceedings.

We find that this case is governed by our decision in *Pastore v. Insurance Department,* 125 Pa.Cmwlth. 611, 558 A.2d 909 (1989). In *Pastore,* the Insurance Department (Department) conducted an investigation of Anthony Pastore for various allegations of violations of the Insurance Department Act of 1921[18] and

---

17. Act of June 21, 1957, P.L. 390, *as amended,* 65 P.S. §§ 66.1–66.4. The Right to Know Law provides that every public record of an agency shall be open for examination and inspection by any citizen of the Commonwealth. Section 2 of the Right to Know Law, 65 P.S. § 66.2.

18. Act of May 17, 1921, P.L. 789, *as amended,* 40 P.S. §§ 1–297.4.

the Unfair Insurance Practices Act.[19] Pastore's counsel filed a motion for discovery, alleging that he asked the Department to view the entire contents of its file, including the results of any investigations and any other pertinent information in regard to the charges against Pastore. The presiding officer granted that portion of the request that sought witness statements and denied as overly broad that portion of the motion that sought the contents of the entire file.

In *Pastore,* we determined that the contents of the Department's file were indeed public records as defined under the Right to Know Law. Section 1 of the Right to Know Law defines "public record" as

> [a]ny account, voucher or contract dealing with the receipt or disbursement of funds by an agency or its acquisition, use or disposal of services or of supplies, materials, equipment or other property and any minute, order or decision by an agency fixing the personal property rights, privileges, immunities, duties or obligations of any person or group of persons: Provided, That the term "public records" shall not mean any report, communication or other paper, the publication of which would disclose the institution, progress or result of an investigation undertaken by an agency in the performance of its official duties, ...; it shall not include any record, document, material, exhibit, pleading, report, memorandum or other paper, access to or the publication of which is prohibited, restricted or forbidden by statute law or order or decree of court, or which would operate to the prejudice or impairment of a person's reputation or personal security....

65 P.S. § 66.1.

Also in *Pastore,* we determined that the Department's investigative file, because it formed the basis for the Department's action in commencing the violation proceedings, would be included in the definition of public record subject to examination if no exception applied. We then went on to conclude that the investigation file fit squarely within the exception that excluded from the definition of public records "any report, communication or other paper, the publication of which would disclose the institution, progress or result of an investigation undertaken by an agency in the performance of its official duties...." *Pastore,* 558 A.2d at 913–914. Accordingly, we affirmed the Department's order that denied Pastore's motion for discovery.

■ The facts of this case are nearly on point with those of *Pastore.* Therefore, we conclude that the Board properly denied Starr's request to view and copy its investigative file and that Starr's right to due process was not violated.

### III.

■ Next, Starr maintains that the Board's revocation of his license violates the Equal Rights Amendment of the Pennsylvania Constitution. Starr argues that he was punished on the basis of his gender for engaging in consensual sexual relations with adults and that he is unconstitutionally prohibited from treating male patients. This argument is simply without merit.

Article I, Section 28 of the Pennsylvania Constitution provides that

> [e]quality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual.

Pa. Const. art. I, § 28.

There is absolutely no evidence in the record to suggest that Starr was discriminated against on account of his gender. The Act is gender-neutral and subjects both male and female practitioners to discipline. Furthermore, even assuming that we accepted Starr's argument that the joint session memo and Commissioner Childress' June 3, 1996 letter were Board directives, the record fails to establish that the pronouncements contained therein are only applicable to male practitioners.

Starr also argues that the revocation of his license is unconstitutional because it prohibits him from treating male patients, rather than only female patients. However, the Act was enacted to protect citizens of the Com-

---

**19.** Act of July 22, 1974, P.L. 589, *as amended,* 40 P.S. §§ 1171.1–1171.15.

monwealth against incompetent practitioners. *See* Preamble to the Act n. 10.[20] Starr's practice of engaging in sexual relations with his patients evidences his lack of concern and professionalism. It also evidences his willingness to set aside the best interest of his patients for his own personal gain. His failure to uphold the ethical standards of his profession makes him a danger to all patients, irrespective of their gender.

 Alternatively, Starr argues that the revocation of his license was excessively harsh because the complainants consented to the relationships.[21] In *Hendrickson v. State Board of Medicine*, 108 Pa.Cmwlth. 124, 529 A.2d 78 (1987), we recognized that we could modify a Board's order if the penalty was unduly harsh. In making that judgment, we are limited to determining whether the penalty imposed is reasonable in light of the violation. *Id.* We cannot substitute our judgment for that of the Board if the penalty imposed was reasonable. *Id.*

The Board found that Starr violated Sections 41(8) and (9) of the Act by engaging in sexual relations with his patients. This is a serious breach of ethical standards and the punishment should reflect that. The Board's order acknowledges that we must take responsibility for our actions and face their consequences. We therefore conclude that the Board's order was reasonable in light of the violations committed.

Accordingly, based upon the foregoing, we affirm the Board's order.

### ORDER

AND NOW, this 4th day of November, 1998, it is hereby ordered that the October 27, 1997 order of the State Board of Medicine is affirmed.

---

**20.** Note 10 was contained in the Preamble to the Act of June 3, 1911, P.L. 636, which was repealed by the Act of July 20, 1974, P.L. 551, which was repealed by the Act of Dec. 20, 1985, P.L. 457, the current version of the Act.

**21.** We note that Section 43(a) of the Act provides that any individual whose license has been revoked may apply for reinstatement after a period of at least five years. 63 P.S. § 422.43(a).